UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDY GOTTLIEB, et al., | : | |
| | : | Case No. 3:20-cv-623-JCH |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, et al., | : | |
| | : | |
| *Defendants.* | : | June 2, 2020 |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY MOTION FOR PRELIMINARY OR PERMANENT
INJUNCTIVE AND DECLARATORY RELIEF
AS TO FIRST CLAIM (BALLOT ACCESS)**

"We have indeed acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008). "The State's power cannot be used, for example, to create barriers that unduly burden a person's right to participate in a state-mandated . . . primary." *Yang v. Kosinski*, No. 20-1494-CV, 2020 WL 2820179, at *7 (2d Cir. June 1, 2020). "[V]oter-plaintiffs have an associational right to vote in political party elections," *Price v. New York State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008) (citing *Lopez-Torres* & *Kusper v. Pontikes*, 414 U.S. 51, 57-58 (1973)).

The State Defendants (Governor Lamont and Secretary of the State Merrill) and the Democratic State Central Committee mistakenly rely almost entirely on *Lopez-Torres*, 552 U.S. at 202, a case in which the plaintiffs "sought a declaration that New York's convention system for selecting Supreme Court Justices violates their First Amendment rights, and an injunction mandating the establishment of a direct primary election to select party nominees for Supreme Court Justice." *Id.*

1

But this case is different from *Lopez-Torres*. Here the State Defendants will hold a primary for state offices on August 11, 2020, but it is alleged that the barriers to ballot access for that primary, imposed by statute and executive order, unduly and unjustifiably burden voter-plaintiffs' First Amendment right to participate. States may or may not be required to hold a primary. But when they do, voter-plaintiffs argue that the primary must be held consistent with the First Amendment by not unjustifiably restricting participation. Plaintiffs here challenge no "internal party processes," as State Defendants and the Democratic State Central Committee seem to contend, but instead challenge a "public electoral function" of the State of Connecticut, quintessential state action. *Jacobson v. Kings Cty. Democratic Cty. Comm.*, 788 F. App'x 770, 774 (2d Cir. 2019) (rejecting claim based on allegedly illegal procedures of party convention). This case is therefore governed by the same well-settled *Anderson-Burdick* test that governed *Campbell v. Bysiewicz*, 213 F.Supp.2d 152 (D.Conn. July 23, 2002), a standard completely unaddressed by the State Defendants.

The State Defendants omit *Anderson-Burdick* from their brief, despite it being the prevailing First Amendment standard "for courts to utilize when faced with a First Amendment challenge to a state election law:"

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. . . .
>
> The standards for review are clear. If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. If the burden is minor, but non-trivial, *Burdick*'s balancing test is applied. . . . Nonetheless, . . . where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed.

2

*Price*, 540 F.3d at 108-09 (citations omitted). The record in this case demonstrates that the state cannot justify the burdens imposed on voter-plaintiffs, especially given COVID-19.

## A. Connecticut's Ballot Access Laws – Even as Modified by Governor Lamont's Executive Order – Impose Severe Burdens on Voters' Associational Rights

Even the State Defendants' evidence shows the severe burden of Connecticut's Ballot Access Laws on voter-plaintiffs. This year, a total of 192 districts will elect State Representatives, State Senators, and U.S. Representatives in Connecticut.[1] Only one district has a primary challenger that received a party endorsement, only six have a primary challenger that obtained 15% of the delegates at a convention, and only seven districts have a candidate even trying to access the ballot by petition. ECF No. 28-1 at 87 of 116 (Ex. C Tbl. 1). Thus, a total of 178 incumbent officeholders, or more than 92% of the State Representatives, State Senators, and U.S. Representatives in Connecticut, will face no primary challenger this year. Over 92% of the "orderly and fair elections" Connecticut purportedly seeks to protect on August 11, 2020 will likely be one-candidate elections where voters have no choice on the ballot.

State Defendants put forward evidence of only two people ever petitioning onto the ballot for a primary for the office of State Senate in Connecticut history, both in 2018 before COVID-19, and in neither did so against an incumbent. ECF No. 28-1 at 89-95 of 116. In 2016, not a single candidate in either party petitioned onto the ballot for a primary for the office of State Senate. *Id.* at 91 of 116. State Defendants' evidence from 2006-2014 fails to differentiate between primaries triggered by a 15% vote at convention or by petition, but the facts demonstrate the severe burden to access the ballot by petition or by party convention for the office of State Senate:

---

[1] This Court can take judicial notice of Connecticut's 151 House Districts, 36 Senate Districts, and 5 Congressional Districts.

3

**Connecticut State Senate**
**Major Party Primaries**
**by Petition or Convention**
**2006-2016**

| Year | Democratic Party Primaries | Republican Party Primaries |
|------|---------------------------|----------------------------|
| 2006 | 0/36 Districts | 0/36 Districts |
| 2008 | 3/36 Districts | 1/36 Districts |
| 2010 | 1/36 Districts | 1/36 Districts |
| 2012 | 3/36 Districts | 0/36 Districts |
| 2014 | 4/36 Districts | 0/36 Districts |
| 2016 | 3/36 Districts | 0/36 Districts |

ECF No. 28-1 at 89-91 of 116 (Ex. D. Tbl. 2). In 2020, the only three candidates petitioning for the ballot for a State Senate primary are Plaintiff Bartlett, the undersigned counsel, and Lee Samowitz Jr., Esq. in Bridgeport. *Id.* at 87 of 116, Ex. C. Tbl. 1.

The State Defendants present evidence of 16 candidates petitioning for primary ballot access for the office of State Representative in all of Connecticut since the passage of Public Act 03-241. *Id.* at 89-91 of 116. Given that 151 State Representatives are up for re-election every year, and the major parties potentially nominate over 300 candidates each year, this shows significant *lack* of ballot access in Connecticut. State Defendants put forth evidence that only three candidates have petitioned for primary ballot access for the office of Governor since 2004, and State Defendants fail to show evidence of even <u>one</u> candidate who has petitioned for access to the primary ballot for the office of U.S. Representative in Connecticut history. *Id.* Not one. This follows 47 years without any primary elections for the office of U.S. Representative leading up to *Bysiewicz v. Campbell*, a fact the district court found significant in concluding that the restrictions on ballot access were overly severe. 213 F.Supp.2d at 156.

Indeed, as Plaintiff Gottlieb says in his supplemental affidavit, he has voted in nearly every election in the Town of Guilford since he became eligible to vote at the age of 18, including party

primaries, as a registered Connecticut Democrat. Supplemental Declaration and Expert Report of Andy Gottlieb (Exhibit 1) at ¶¶ 7, 12. In none of these elections has Plaintiff Gottlieb ever had the opportunity to choose from more than one candidate for the offices of State Representative or State Senator in the party primary. *Id.* at ¶ 14. Not once. When Plaintiff Gottlieb attempted to access the ballot himself, he personally faced the severe burdens of Connecticut's Ballot Access Laws. *Id.* at ¶¶ 2-4, 6. He collected signatures himself each and every day, and marshaled the support of many volunteers who volunteered hours of their time to help him. *Id.* But even with their tireless efforts, they fell short, because of the severe burden imposed by Connecticut's Ballot Access Laws. *Id.*

All of this evidence demonstrates the severity of the burden on voter-plaintiffs even before COVID. With the onset of the pandemic, however, it is evident that Connecticut's restrictions – even with the slight modifications made by Governor Lamont – are severely burdensome.

As the attached declarations demonstrate, Plaintiffs' fears about petitioning in the time of coronavirus have come to fruition. The task of gathering signatures, as expected, has become significantly more difficult. *See* Supplemental Declaration of Jason Bartlett (Exhibit 2) at ¶¶ 4-11; Declaration of Sergio Rodriguez (Exhibit 3) at ¶¶ 6-10. Mr. Bromley says that he is "aware of testimony" that "individuals with experience circulating petitions can collect 8 to 10 signatures per hour." ECF No. 28-1 at ¶ 57. This vague statement should be given little weight, even at the preliminary injunction stage. But assuming it is true, the ease with which individuals could gather signatures before COVID-19 only shows the difficulty that candidates face now. Campaigners hired or volunteering to go door-to-door are collecting dramatically fewer signatures than they were able to collect prior to the pandemic. Ex. 3 at ¶¶ 6-10. It is more difficult to hire individuals or find volunteers to go door-to-door in the first place. Ex. 2 at ¶¶ 10. Additional evidence of the

5

difficulty gathering petition signatures was presented to the state prior to the filing of its brief, on Thursday, May 28. *See* Declarations of Tawana Galberth and Renee Brown (Exhibits 4 & 5).

The State Defendants' only response to COVID's unique and extraordinary circumstances is that plaintiffs' contentions are "nothing more than speculation and conjecture." ECF No. 28-1 at ¶ 50. Not so. To begin, plaintiffs had significant experience gathering petition signatures that render their opinions about the feasibility of petition signature gathering reasonable and worthy of considerable weight. ECF No. 9-2 (Gottlieb Report), 9-3 (Bartlett Report). A plaintiff with common sense (let alone knowledge, training, and experience running campaigns) to know that a proposed plan of action will be burdensome, costly, or even dangerous to his or her health need not put him or herself (and others) at risk simply in order to prove that their opinions are not speculative.

We are living in a pandemic and the human risks at play here should not be taken lightly. It is obvious and known to everybody, including the State Defendants, that the deadly pandemic makes it more logistically difficult to engage in an intensive petition signature gathering drive. Simply labeling the concern "speculative" is an abdication of the responsibility to engage with a sensitive reality and fails to address plaintiffs' argument that the conditions of the pandemic seriously "chill" petition drives from occurring in the first place. ECF No. 9 at 8. Moreover, the State Defendants were given evidence of the difficulty faced by campaign workers collecting signatures, on Thursday, but still maintained in their brief yesterday that no efforts were being made. *See* Exs. 4-5 (produced to the State Defendants May 28, 2020).

The State Defendants' arguments about the ease of collecting signatures using new methods is, in fact, nothing more than conjecture. Mr. Bromley appears to have no experience running petition signature drives as a candidate or a campaign manager, but speculates that

candidates can now "quickly and easily" use new methods created by the Governor's executive order to sign petitions electronically. ECF No. 28-1 at ¶ 51. Mr. Bromley provides no evidentiary foundation for this speculation. He says candidates should use party lists, but provides no evidence that candidates can "obtain . . . a list of . . . email addresses of . . . party members" as he postulates. *Id*. Mr. Bromley speaks of "emailing petition forms to friends, family and other personal contacts," *id.* at ¶ 54, but omits the requirements for individuals to (1) print out the petitions, (2) sign them and provide sensitive information on them including date of birth, (3) scan them back into their computer system, and (4) email them back to the candidate, steps which he concedes would require "follow up," *id.* at ¶ 48, and an added layer of verification.

  Mr. Bromley is unrealistic. He omits that voters in a household must sign each petition separately on a separate piece of paper before scanning it back and emailing it to the candidate or else the signatures will not be counted. He omits that many voters lack printers or other electronic devices required for the new mechanisms. Ex. 3 at ¶ 11 ("[S]ome friends could not even print the petition form for signing."); Ex. 4 at ¶¶ 27-33 (explaining that digital options impose barriers on low-income voters). Mr. Bromley's idea that candidates "post[] [petitions] on . . . various social media pages," ECF No. 28-1 at ¶ 51, fails to account for the various *off-line* tasks that are required of individuals who want to download the petition off of a social media page (if they somehow find it): print the petition out or use some unnamed software to sign it electronically, and then return the petition by email or by having the campaign individually come pick it up. Ex. 3 at ¶ 11. As Plaintiff Gottlieb points out, Mr. Bromley and the Democratic State Central Committee's evidence contain factual errors and are misleading. Ex. 1 at ¶¶ 1-11.

  Mr. Bromley never avers to have engaged in such an effort himself—but in fact, nobody has before this election. One individual who has tried is proposed Plaintiff Sergio Rodriguez. Ex.

7

3 at ¶ 11. Mr. Rodriguez has sent over 500 emails and has sent his petition to over 1,000 followers on Facebook. *Id.* Out of 500 emails, Mr. Rodriguez has obtained only 8 petition signatures, a response rate of under 2%. *Id.* From Facebook, he has only obtained 2 signatures, a response rate of under 1%. *Id.* Overall he has secured only 3.3% of the signatures he has gathered using online methods. *Id.* at ¶¶ 10-11. An experiment by an enthusiastic volunteer on the undersigned's State Senate campaign, Ms. Antonia Oglesby, returned an even lower response rate for text messaging to obtain petition signatures—0.005% to even acknowledge receiving a text. *See* Declaration of Antonia Oglesby (Exhibit 6) at ¶¶ 1-7. Mr. Bartlett has also made efforts to gather signatures using online methods and social media, *see* https://bartlett4senate.com/ (offering Democratic Party members of New Haven an online signature petition portal created by Plaintiff Bartlett's campaign), but he still believes that an order must issue in order to make access to the ballot possible for the August 11, 2020 primary election. Ex. 2 at ¶¶ 11-12.

As the State Defendants concede, "electronic circulation and collection of signatures has not been common within the context of ballot access petitions prior to 2020." Mem. at 28. The State goes on to give the example of a government-created website, my2020census.gov, to show that it isn't a novel technique—*but that makes plaintiffs' point*, because a government-created secure and trusted web portal for submitting signatures is one part of plaintiffs' requested relief. ECF No. 9 at 3.

Mr. Bromley points to the petition signature gathering drive of a self-funded millionaire, David Stemerman, to make his point, ¶ 51, which refutes itself. If only millionaires can afford to run for office, Connecticut's system can hardly be considered constitutionally sufficient. *See* Mark Pazniokas, *Stemerman pledges another $10M to his self-funded campaign*, CONNECTICUT MIRROR

(Jun. 25, 2018), *available at* https://ctmirror.org/2018/06/25/stemerman-pledges-another-10-million-self-funded-campaign/ (last accessed June 2, 2020).

Connecticut's few party primaries show that the requirements for accessing the ballot in this state are severely burdensome. More than 90% of officeholders face no primary year after year and many voters, such as Plaintiff Gottlieb, Ex. 1 at ¶¶ 12-13, never see any primaries for important state offices. This is strong evidence that Connecticut's Ballot Access Laws "unduly 'limit the field of candidates from which voters might choose,'" *Maslow v. Bd. of Elections in City of New York*, 658 F.3d 291, 297 (2d Cir. 2011) (citing and quoting *Anderson v. Celebrezze*, 460 U.S. 780, 786–87 (1983)); *Campbell v. Bysiewicz*, *supra*, violating the First Amendment.

With the COVID-19 pandemic, the burden is even more severe, as shown by the evidence submitted by Plaintiffs. *See* Exs. 2-3. *At the very least*, it cannot be said that a requirement to collect over 1,000 signatures in under 20 days is "trivial" warranting the type of deference upon which the State Defendants insist. *Price*, 540 F.3d at 110 (finding state law election burdens on primary voters "not trivial" and applying *Anderson-Burdick*). Thus, this Court should weigh the severity of the restrictions against the State's offered reasons for them and resolve this case under the *Anderson-Burdick* test.

**B. The State's Reasons Fail to Justify the Restrictions**

The State Defendants put forward one "main interest" in regulating primary ballot access, "simply to ensure orderly and fair elections." ECF No. 28-1 at ¶ 9.[2] Given that the regulations

---

[2] The Democratic State Central Committee, through its executive director, says that it opposes further changes to the petitioning requirements in Connecticut, but falls short of saying that it believes any change expanding ballot access would violate the party's constitutional rights. The director simply says that she believes Governor Lamont's changes are "reasonable" and no further action is needed. ECF No. 29 at 9, 40 of 43.
    The director further says that "disband[ing] endorsement convention process would harm the DSCC's ability to manage its own party," *id.*, but plaintiffs seek no such thing. Plaintiffs seek

challenged here prevent a primary election from even occurring over 90% of the races for State Representative or State Senator, it is hard to see how the state is advancing the purpose it purports to advance with its Ballot Access Laws. The State further fails to justify how plaintiffs' proposed remedies would in any way undermine its admittedly great interest in orderly and fair elections. Plaintiffs – candidates and voters – obviously share an interest with the State Defendants in orderly and fair elections. They simply want orderly and fair elections to take place, with voter and candidate participation. They simply want elections to take place with more than one choice of candidate on the ballot. They want the voters—members of the Democratic Party of Connecticut— to decide, instead of smoke-filled – or smoke-free – rooms of party insiders.

The only concrete complaint the State Defendants put forward about the plaintiffs' proposed relief is in maintaining the 16-day window that Governor Lamont's order imposes on the collection of signatures, a 16-day window ending June 11, 2020. The State says it must maintain that deadline because "extending it beyond the two days it already has been extended could significantly interfere with the broader election calendar." ECF No. 28-1 at 20 of 116.

But the State's own evidence shows this not to be the case: Mr. Bromley's declaration states that Registrar of Voters must be given seven days to verify the signature pages submitted by

---

ballot access to a party primary run by the state. State law restrictions on party primaries are state action to be adjudicated under the standards of the *Anderson-Burdick* test. The Supreme Court has held that overly burdensome requirements to access the primary ballot can be unconstitutional even where avenues of ballot access for the general election are available. *Bullock v. Carter*, 405 U.S. 134, 146–47 (1972) ("[W]e can hardly accept as reasonable an alternative that requires candidates and voters to abandon their party affiliations in order to avoid the burdens of the filing fees imposed by state law.").

As Plaintiff Bartlett points out, it is unclear whether the executive director and counsel for the DSCC have authority from the committee to intervene in the lawsuit on the side of the State Defendants, Ex. 2 at ¶¶ 15-19, because the DSCC never held a vote. *Id.*

And although the director says the nominating process "reflects the will of the people," ECF No. 29 at 7 of 43, what could reflect the will of the people better than a vote of the party members themselves? Ex. 2 at ¶ 19.

candidates before they can be required to submit them to the Secretary of the State, who in turn needs an additional nine days to review and calculate the total numbers of signatures and report back to the towns who has obtained ballot access. *Id.*

Mr. Bromley admits "that these dates are not set to accommodate the smallest of the offices on the ballot, but are set to accommodate the largest offices such as statewide offices where candidates collect tens of thousands of signatures." *Id.* ¶ 59b. But this is a significant admission because, in 2020, *no statewide offices are up for election*. The State therefore leaves unexplained: Why do Registrars of Voters and the Secretary of the State need as much time – sixteen days – to count and verify the signatures, as the candidates need to collect them? It is not said what steps the Registrars or the Secretary must take in order to verify, review, count, or calculate, or why they would require sixteen days. It is therefore the State Defendants' pure speculation that extension of the deadline to collect signatures would in any way "disturb the election calendar." It would not.

Under the governing *Anderson-Burdick* standard, plaintiffs have easily shown a severe burden on voters' associational rights imposed by Connecticut's Ballot Access Laws, even as modified by Governor Lamont's executive order. The State Defendants fail to justify the severe burdens imposed by Connecticut's Ballot Access Laws with anything besides the vague invocation of "orderly and fair elections," an interest that plaintiffs and the undersigned share with State Defendants. Contrary to the State Defendants' contentions, the weight of the State Defendants' and the Plaintiffs' evidence demonstrate a very high likelihood of success on the Plaintiffs' First Claim. The State Defendants' memorandum fails to address the other three factors weighed by courts considering preliminary injunctions, such as irreparable harm and the public interest.

As a result, and for the reasons stated above, Plaintiffs' motion should be granted, and an order in the nature of the relief requested in the Motion, ECF No. 9 at pp. 2-3 (prayer for relief), should be issued.

Dated: June 2, 2020

Respectfully Submitted,

PLAINTIFFS, ANDY GOTTLIEB,
LORNA CHAND, JASON BARTLETT,
AND RICHARD LACOURCIERE, FOR
THEMSELVES AND THE PROPOSED
CLASS OF CONNECTICUT VOTERS

By:\_\_\_\_\_/s/_____
Alexander T. Taubes, Esq.
Federal Bar No.: ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com

*Their Attorney*