**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANDY GOTTLIEB, ET AL., | : | CIVIL CASE NO. |
| Plaintiffs, | : | 3:20-CV-0623 (JCH) |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | |
| Defendants. | : | JUNE 8, 2020 |
| | : | |

**RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY OR PERMANENT**
**INJUNCTIVE AND DECLARATORY RELIEF (DOC. NO. 9)**

## I.      INTRODUCTION

Plaintiffs Andy Gottlieb, Lorna Chand, Jason W. Bartlett, and Richard Lacourciere (collectively, "plaintiffs") bring this action against Governor Ned Lamont and Secretary of State Denise Merrill, challenging the enforcement of Connecticut's ballot access laws as unconstitutional under the First and Fourteenth Amendments. See Amended Complaint ("Am. Compl.") (Doc. No. 8).

Pending before the court is plaintiffs' Motion for Preliminary Injunctive ("Mot.") (Doc. 9). Plaintiffs seek injunctive and declaratory relief as to Count One only. Mot. at 1. In Count One, plaintiffs challenge the petition signature requirements for candidates to access the August 11, 2020 primary ballot. Plaintiffs allege that, in light of the circumstances created by the COVID-19 pandemic, these laws unduly burden their First and Fourteenth Amendment rights. Plaintiffs seek various injunctive relief including, inter alia, a reduction of the signature requirement to 1% of the registered party members in the district and an extension of the deadline to July 15, 2020. See Mot. at 3. For the reasons stated below, plaintiffs' Motion is denied.

II.    **BACKGROUND**[1]

A.    <u>Factual Background</u>

1.    The Parties

Plaintiff Lorna Chand is a Connecticut resident and registered voter.  Am. Compl. ¶ 18. Chand wants to vote for a wider variety of candidates, but she claims is restricted from doing so by Connecticut's ballot access laws.  Id.

Plaintiffs Andy Gottlieb ("Gottlieb"), Jason W. Bartlett ("Bartlett"), and Richard Lacourciere ("Lacourciere") are Connecticut residents and candidates for various offices in the Connecticut legislature.  See Id. ¶¶ 17, 19, 20.  Bartlett is a candidate for the 10th State Senate District of the Connecticut General Assembly; Lacourciere is a candidate for the 24th State Representative District of the Connecticut General Assembly.  Id. ¶¶ 19, 20.  Gottlieb does not specify which office he is running for, only that he "would likely run again for state representative or state senator, but for the existence and likely enforcement of [Connecticut's] Ballot Access Laws."  Id. ¶ 17.  Gottlieb ran for state senate in 2018, but he fell short of ballot access by 32 signatures.  Id. ¶ 17.  The candidate-plaintiffs claim that Connecticut's ballot access laws burden their rights of association and speech.  Id. ¶ 57.

2.    Connecticut's Ballot Access Laws

Connecticut ballot access laws provide candidates for state or district offices three avenues to appear on the ballot.  First, a candidate can receive the endorsement of the party at the party convention.  For candidates that do not receive the endorsement, section 9-400 of the Connecticut General Statues provides two additional

---

[1] Unless otherwise indicated, the court accepts, for purposes of this Motion, the allegations of the Amended Complaint and the testimony in the affidavits recounted herein.

avenues: (1) by receiving at least 15% of the delegate vote at a convention held by that political party; or (2) by circulating a petition and obtaining the signatures of five percent of the enrolled members of the party in the district.  See Conn. Gen. Stat. § 9-400(b). This second option, the petitioning process, was added by the Connecticut legislature by Public Act 03-241, effective January 1, 2004.  Plaintiffs contend that they are unlikely to obtain ballot access by convention.  See Am. Compl. ¶¶ 19, 20.  None of the plaintiff-candidates received 15% of the delegates' votes in this election cycle.  See, e.g., Declaration of Jason Bartlett ("Bartlett Decl.") (Doc. No. 31-2) ¶ 2. Thus, their appearance on the August 11 primary ballot depends upon their ability to collect the required number of signatures pursuant to Connecticut's petitioning process.

The gathering of petition signatures is governed by sections 9-404a to 9-404c, inclusive of the Connecticut General Statutes.  Candidates are given until 4:00p.m. on the fourteenth day after petitions are made available to collect and submit signatures. This year, petitions were made available by the Secretary of State on May 26.  Am. Compl. ¶ 31.  The 14-day window was therefore originally scheduled to close on June 9 at 4:00pm.  During these 14 days, a candidate for the office of state representative or state senator must collect and submit signatures from five percent of the party members in his district.  Under Connecticut law, these petitions must be collected in person and attested to by an eligible circulator under sections 9-400 and 9-410 of the General Statutes.

3.    The COVID-19 Pandemic

All parties agree that the outbreak of COVID-19 has caused significant disruption to the 2020 election cycle in Connecticut and, more broadly, to the daily lives of all

3

Connecticut residents.  In response to the pandemic, Governor Lamont declared a public health emergency on March 10, 2020, which shall remain in effect until September 9, 2020, unless terminated earlier by the Governor.  Governor Lamont also issued a series of Executive Orders aimed at containing the spread of the deadly virus. Among them, Government Lamont issued a "Stay Safe, Stay Home" Executive Order on March 20, 2020.  See Executive Order 7H.  This Order placed restrictions on all workplaces of nonessential businesses.  On March 26, 2020, the Governor prohibited social gathering of six people or more, with limited exceptions.  See Executive Order 7N.

Most relevant to this case, on May 11, Governor Lamont issued Executive Order 7LL, which altered the statutory requirements for petitioning onto the August primary ballot.  The Executive Order extended the deadline to submit petitions by two days, from June 9 to June 11, for a total petitioning period of 16 days.  See Executive Order 7LL. Furthermore, the Executive Order amended the statutory signature collection process— referred to as a "wet petitioning"—by eliminating the in-person signature requirement. Id.  Under Executive Order 7LL, a registered voter may submit a signed petition form by mail or electronic means to the candidate without a witness.  Id.  Finally, the Executive Order also reduced the number of signatures required by thirty percent.[2]  Id.  As it relates to candidates for the office of state representative and state senator, Executive Order 7LL reduced the number of signatures required from 5% to 3.5% of all registered party members in the district.  Am. Compl. ¶ 12.  Under these COVID-19 modifications,

---

[2] The number of signatures required varies greatly depending upon the particular office the candidate seeks because it is a percentage of the registered party voters in the district in which the candidate is petitioning.

a Democratic candidate in Gottlieb's senate district would need to collect over 700 valid signatures from registered Democrats to petition onto the ballot.  Gottlieb Aff. ¶ 23.  The figure is substantially more in districts with greater numbers of registered Democrats, such as the district where Bartlett is running.  Id.  Bartlett estimates that he must obtain the signatures of more than 1,000 registered Democrats.  Bartlett Aff. ¶ 16.  Lacourciere would need 192 signatures.  See Declaration of Theodore Bromley ("Bromley Decl.") (Doc. No. 28-1) ¶ 26.

> B.     Procedural Background

Plaintiffs filed their initial Complaint on May 6, 2020 (Doc. No. 1), followed by an Amended Complaint (Doc. No. 8) and the instant Motion (Doc. No. 9) on May 12, 2020, one day after Governor Lamont issued Executive Order 7LL.  Following a telephonic status conference (Doc. No. 22), the court scheduled briefing.  The court then held a hearing on this Motion on June 5, 2020, utilizing the social medial platform Zoom.  At oral argument, the court granted the Connecticut Democratic State Central Committee's Motion to Intervene as defendant (Doc. No. 26).

## III.   STANDARD

"Ordinarily to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to 'demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'"  Yang v. Kosinski, No. 20-1494, 2020 WL 2820179, at *5 (2d Cir. June 1, 2020) (quoting Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).  "The movant also must show that the balance of equities tips in his [or her] favor."  Yang, 2020 WL 2820179, at *5 (internal quotation marks omitted).

But where, as here, the movant is seeking to modify the status quo through a "mandatory preliminary injunction," as opposed to seeking a "prohibitory preliminary injunction" to maintain the status quo, "the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." Id. (citing Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006).

The nature of a preliminary injunction is "an extraordinary and drastic remedy." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam). Such a remedy "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Id. (emphasis in original).

## IV.   DISCUSSION

Plaintiffs contend that, because of the restrictions put in place in response to the COVID-19 pandemic, Connecticut's ballot access laws impose an unconstitutional burden, even as amended by Executive Order 7LL.[3]  See Plaintiffs' Memorandum in Support ("Pl. Mem.") (Doc. No. 9-1), at 3.  Plaintiffs therefore move this court to grant their Motion for various injunctive relief.  See Mot. at 3.  Because plaintiffs fail to demonstrate a clear or substantial likelihood of success on the merits, they have failed to demonstrate that they are entitled to the extraordinary relief they seek.

---

[3] Although plaintiffs repeatedly suggest that Connecticut's ballot access laws impose severe burdens on candidates generally, see, e.g., Plaintiffs' Reply ("Pl. Reply") (Doc. No. 31), at 5 ("All of this evidence demonstrates the severity of the burden on voter-plaintiffs even before COVID.") (emphasis added), counsel for the plaintiffs specified at oral argument that their Motion is not a facial challenge of the election laws.  Rather, their claim is that the ballot access laws, as amended by Executive Order 7LL, are unconstitutional as applied.

A.   <u>Plaintiffs' First Amendment Rights</u>

Although "administration of the electoral process is a matter that the Constitution largely entrusts to the States,"[4] the Supreme Court has long recognized that "unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." <u>Kusper v. Pontikes</u>, 414 U.S. 51, 57 (1973). That includes state laws governing which candidates may appear on a ballot, including primary ballots. <u>See, e.g.</u>, <u>New York State Bd. of Elections v. Lopez Torres</u>, 552 U.S. 196, 204 (2008) ("We have . . . acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment."); <u>Yang v. Kosinski</u>, No. 20-1494, 2020 WL 2820179, at *7 (2d Cir. June 1, 2020) ("The State's power cannot be used, for example, to create barriers that unduly burden a person's right to participate in a state-mandated presidential primary."). Petitioning requirements, specifically, can be so burdensome as to violate a plaintiff's First Amendment rights. <u>See, e.g.</u>, <u>Lerman v. Bd. of Elections in City of New York</u>, 232 F.3d 135, 153 (2d Cir. 2000) (invalidating requirement that witnesses for primary ballot petitions reside in particular congressional district); <u>cf Maslow v. Bd. of Elections</u>, 658 F.3d 291, 298 (2d Cir. 2011) (holding that the state's requirement that witnesses for primary ballot petitions be a member of the candidate's party did not severely burden plaintiffs' First Amendment rights.).

---

[4] Article 1, Section 4 of the Constitution provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators." Art. I, § 4, cl. 1. This "power is matched by state control over the election process for state offices." <u>Clingman v. Beaver</u>, 544 U.S. 581, 586 (2005).

These ballot access laws "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30-31 (1968).  In this case, plaintiffs contend that Connecticut's election laws severely burden the candidate-plaintiffs' right to access the ballot and the voter-plaintiff's right to select from an adequate field of candidates.   The rights asserted by the candidate-plaintiffs and the voter-plaintiff "do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Anderson, 460 U.S. at 786.  In either context, "[o]ur primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose."[5] Id.; see also Maslow, 658 F.3d at 297 n.5 ("To the extent that a candidate is denied access to the ballot, voters are to the same degree denied the right to vote for that candidate.").

B.      The Anderson-Burdick Framework

"[N]o litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions." Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 192 (1999) (internal quotation marks and citations omitted).  Instead, courts "conduct a two-step inquiry" that derives from Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992). Yang, 2020 WL 2820179, at *6. The Second Circuit has very recently described this two-step inquiry as follows:

---

[5] As the Second Circuit observed in Maslow, "the Supreme Court has focused almost exclusively on the field of candidates available for voters to choose from at a general election, not the field vying for a party's nomination." 658 F.3d at 297 (collecting cases).  Nonetheless, even restrictions on primary ballot access can severely burden a plaintiffs' First Amendment's rights.  See, e.g., Bullock, 405 U.S. at 146–47 (holding that independent access to general election ballot is insufficient to overcome extraordinarily severe restrictions on access to the primary ballot); see also Lerman, 232 F.3d at 153.

First, we ascertain the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake. The restriction could qualify as reasonable [and] nondiscriminatory or as severe. Once we have resolved this first question, we proceed to the second step, in which we apply one or another pertinent legal standard to the restriction.

If the restriction is reasonable [and] nondiscriminatory, we apply the standard that has come to be known as the Anderson-Burdick balancing test: we must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then . . . identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment under this more flexible standard, we must determine [both] the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights.

If the restriction is severe, then we are required to apply the more familiar test of strict scrutiny: whether the challenged restriction is narrowly drawn to advance a state interest of compelling importance. It follows then that the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged [restriction] burdens First and Fourteenth Amendment rights.

Yang, 2020 WL 2820179, at *6 (internal quotation marks omitted) (alterations in original). When conducting this inquiry, however, courts should consider the challenged regulations, and the burdens they impose, not in isolation but "within the context of the state's overall scheme of election regulations." Lerman, 232 F.3d at 145.

       1.     Severity of the Burden on Plaintiffs' Rights

At this first step of Anderson-Burdick, the court must analyze the burden on plaintiffs' rights. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016) (comparing Lubin v. Panish, 415 U.S. 709, 719 (1974) (striking $701.60 filing fee for ballot-access petition because it excluded indigent candidates from running for office with no reasonable alternative means of access), and Williams v. Rhodes, 393 U.S. 23,

9

24 (1968) (striking election laws that "made it virtually impossible" for independent parties to gain ballot access), with Jenness v. Fortson, 403 U.S. 431, 438 (1970) (upholding petition signature requirement of five percent of all registered Georgia voters and noting that such a requirement does not "freeze the political status quo")); see also Lopez Torres, 462 F.3d at 188 ("These cases establish that the First Amendment prohibits a state from maintaining an electoral scheme that in practice excludes candidates, and thus voters, from participating in the electoral process, unless the exclusionary regulations are necessary to further a compelling state interest.") (citing Bullock v. Carter, 405 U.S. 134, 143 (1972); Williams, 393 U.S. at 35; and Anderson, 460 U.S. at 793).

a.    Connecticut's Petitioning Requirements

Under Connecticut's petitioning scheme, as modified by Executive Order 7LL, the candidate-plaintiffs can petition onto the primary ballot with the signatures of 3.5% of the enrolled party members in their district.  See Conn. Gen. Stat. § 9-400; Executive Order 7LL.  Bartlett, who is running for the office of state senator in the 10th State Senate District, must obtain 1,028 signatures to appear on the ballot, the most of any of three candidate-plaintiffs.[6]  See Declaration of Theodore E. Bromley ("Bromley Decl.") (Doc. No. 28-1) ¶ 25.  Therefore, during the 16-day window available to circulate and collect petitions, Bartlett must obtain, on average, 64 signatures a day.[7]  Working with just four other circulators, Bartlett and his circulators would each need to secure 13 signatures a

---

[6] Lacourciere must obtain only 192 signatures.  Bromley Decl. ¶ 26.  It is unclear from Gottlieb's Affidavit whether he intends to run for office in the current election cycle.  See Affidavit of Andy Gottlieb ("Gottlieb Aff.") (Doc. No. 9-2).  Were Gottlieb to run for the same seat he ran for unsuccessfully in 2018, he would need approximately 700 signatures.  Id. ¶ 23.

[7] Lacourciere must obtain 12 signatures a day to reach the required number within the 16-day window; Gottlieb would need 44 signatures a day.

day to meet this requirement.  Plaintiffs have failed to demonstrate that such a figure is impossible, or virtually impossible, to obtain.  Indeed, one circulator alone working for the campaign of plaintiffs' counsel obtained 13 signatures on May 28.  See Affidavit of Tawana Galberth ("Galberth Aff.") (Doc. No. 31-4) ¶ 19.

In reaching its conclusion, the court does not discount the challenges faced by plaintiffs and their staff in light of the COVID-19 pandemic and the various restrictions placed on social interactions.  Rather, the court simply notes that the figures above suggest that it is not impossible for plaintiffs to petition onto ballot and that, therefore, the challenged regulations do not "virtually exclude" or severely burden them. Furthermore, although COVID-19 has undoubtedly made plaintiffs' "wet" petitioning efforts much more difficult, these challenges have been lessened by Executive Order 7LL, which made several important modifications to Connecticut's petitioning process. The present case is therefore very different from cases in which states, when faced with the realities of COVID-19, insisted on strict application of existing election regulations. See e.g., Esshaki v. Whitmer, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) ("[T]he combination of [Michigan's] strict enforcement of its ballot-access provisions and [its] Stay-at-Home Orders imposed a severe burden on the plaintiff's ballot access."); Libertarian Party of Illinois v. Pritzker, No. 20-CV-2112, 2020 WL 1951687, at *5 (N.D. Ill., Apr. 23, 2020) ("The combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their names placed on the general election ballot.").

Had the Governor failed to modify the election laws during this public health emergency, plaintiffs' claim of severe burden would have had much greater force. But that is not this case. Executive Order 7LL, which was issued on May 11, 2020 (15 days before the petitioning period began), reduced the number of signatures required by 30% and extended the deadline by two days. In addition, the Executive Order modified the signature collection process by eliminating the in-person signature requirement, thus permitting a registered voter to mail or email a signed petition form to the candidate. See Executive Order 7LL. The Executive Order thus eliminated the requirement that circulators personally witness each signature.[8]

Guidance issued by the Secretary of State made clear that the Governor's Executive Order allowed candidates to distribute petition forms to voters in a variety of ways that were previously not permitted: mailing or emailing petition forms directly to voters, posting the petition form on campaign websites, or posting the form on social media. See Primary Petition Ballot Access Guidance, Ex. 1 (Doc. No. 28-1), at 114. Petitions could also be circulated in person consistent with social distancing restrictions. Id. The Governor began to ease the "Stay at Home" restrictions on May 20, 2020, several days before the 16-day petitioning period began. See Executive Order 7PP (permitting many nonessential businesses, such as restaurants, to reopen with certain exceptions); see also Thomas v. Dewine, No. 20-3526, 2020 WL 2702483, at *4 (6th

---

[8] Witness requirements, in other contexts, have been heavily litigated in this Circuit as burdens on the petitioning process. See, e.g., Lerman, 232 F.3d at 139 (2d Cir. 2000) (holding that New York's witness residence requirement severely burdened plaintiffs' First Amendment rights); Maslow v. Bd. of Elections, 658 F.3d 291, 298 (2d Cir. 2011) (holding that New York's party witness rule did not severely burden plaintiffs' First Amendment rights).

Cir. May 26, 2020) (declining to find a severe burden on plaintiffs' rights when Ohio had begun to lift its stay-at-home restrictions by the time the petitioning period began).

Despite the myriad of changes Executive Order 7LL made to the petitioning requirements, the plaintiffs contend that Connecticut's election laws nonetheless severely burden their access to the primary ballot. They contend that candidates and their staff have utilized without success the methods made available by the Executive Order. One candidate, for example, sent the petition to over 500 email contacts and 1,000 Facebook users. He received only eight petition signatures from the emails and two signatures from Facebook. See Declaration of Sergio Rodriguez ("Rodriguez Decl.") (Doc. No. 31-3) ¶ 11. Another individual canvassing for a different candidate texted 193 numbers and received only one reply. See Declaration of Antonia Oglesby ("Oglesby Decl.") (Doc. No. 31-6) ¶ 7. Plaintiff Bartlett endeavored to obtain signatures using an online web portal. See Pl. Reply at 8. At oral argument, plaintiffs' counsel represented that this effort had led to date to the collection of 100 signatures.

Despite the difficulties that the plaintiffs have encountered in petitioning via these non-traditional means, the court cannot conclude, based on the record before it, that plaintiffs have shown a clear likelihood of success on the issue that their rights have been severely burdened. That is, plaintiffs have not provided sufficient evidence to demonstrate that their inability to obtain the required signatures reflects the near impossibility of meeting the statutory requirements and is not the result of, for example, an insufficient or ineffective effort. For example, plaintiffs do not specify how the recipients of these emails or text messages were selected.[9]   Similarly, Bartlett does not

---

[9] It does not appear that plaintiffs obtained email lists of Democratic voters in their districts.

describe how broadly he advertised the online portal that he had created.  Further, at oral argument on June 5, plaintiffs' counsel represented that individuals had reported to Bartlett difficulties with his web portal.  However, there was no evidence regarding what steps Bartlett had taken, or intends to take to address these issues and to maximize the web portal's utility in the time remaining from learning of the problems.

The court recognizes that COVID-19 presents challenges to the task of traditional, in-person petitioning.  As noted above, collection of wet petitions, however, is not impossible.  Further, as discussed above, the Governor's response to those challenges opened new petitioning options which can reach more voters.[10]  Based on the record before the court, plaintiffs failed to clearly show the virtual impossibility of attaining the required number of signatures if a candidate employs the various petitioning methods.  Based on the record before it, the court concludes that Connecticut's petitioning requirements are reasonable.[11]  Although a finding of severe burden may be made by a preponderance of the evidence after a full trial on the merits, plaintiffs have not now made a clear showing that there is a likelihood of success on the merits of showing such a severe burden.

b.    Connecticut's Overall Electoral Scheme

Even if the court were to conclude that the plaintiffs had carried their burden on their Motion of making a clear showing of likelihood of success on the issue that Connecticut's petitioning requirements, as modified by Executive Order 7LL, severely

---

[10] The fact that the Executive Order 7LL allows many more avenues of petition circulation than previously permitted by the statute also suggests that plaintiffs' evidence regarding the historic lack of candidates petitioning onto the ballot is not weighty, in particular to this as-applied challenge to the 2020 primary election.  See Pl. Reply at 3.

[11] There is no claim that the regulations at issue are discriminatory.

burden their ballot access rights, this conclusion would not be dispositive of the first

inquiry of Anderson-Burdick.  Although plaintiffs focus almost exclusively on

Connecticut's petitioning process, it is well-settled that, at Anderson-Burdick's first step,

"[t]he burden imposed by the challenged regulation is not evaluated in isolation, but

within the context of the state's overall scheme of election regulations." Lerman, 232

F.3d at 145 (citing Prestia v. O'Connor, 178 F.3d 86, 87 (2d Cir. 1999)).  An evaluation

of Connecticut's "overall scheme" makes it clear that Connecticut's election laws, as

altered in light of COVID-19, do not severely burden plaintiffs' rights.

As noted previously, the petitioning process that plaintiffs challenge is part of a

broader statutory scheme which provides several avenues to ballot access.  First, a

candidate can seek to win the party's endorsement at the convention.  In addition,

candidates that fail to win the endorsement can still gain access to the primary ballot by

receiving 15% of the delegate vote at the convention.[12]  The petitioning process

provides the final avenue for candidates that are unsuccessful during the convention.

See Conn. Gen. Stat. §§ 9-400, 9-406 and 9-415.

Although plaintiffs contend that they were never likely to win the party's support

at the convention, they do not claim that they could not pursue ballot access through all

of the three available options.  The court therefore evaluates their claim under

LaRouche v. Kezer's "totality approach."  990 F.2d 36, 39 (2d Cir. 1993).  Under this

approach, "if [any] alternative would be constitutional standing alone, the other[s] must

be viewed as broadening the opportunities for ballot access and [are] a fortiori

---

[12] At the convention, Bartlett received 6 votes out of the 53 delegates, missing the 15% requirement by 2 votes.  See Declaration of Jason Bartlett ("Bartlett Decl.") (Doc. No. 31-2) ¶ 2.

constitutional."  Id.; see also Lopez Torres v. New York State Bd. of Elections, 462 F.3d 161, 194 (2d Cir. 2006), rev'd on other grounds, 552 U.S. 196 (2008) ("LaRouche stands only for the principle that where an adequate means of ballot access exists, the addition of another means of access to the same ballot only increases access and thus is constitutional unless it is wholly irrational.") (emphasis in original); Utah Republican Party v. Cox, 892 F.3d 1066, 1088 (10th Cir. 2018) ("The lesson from LaRouche, then, is that, provided it is not wholly irrational, an otherwise unconstitutional ballot-access statute will not be struck down so long as there is an alternative, constitutional, method of accessing the ballot.").[13]  Thus, despite the plaintiffs' focus on the petitioning process, the court considers whether there exists other constitutional alternatives to access the primary ballot.

In New York State Board of Elections v. Lopez Torres, 552 U.S. 196 (2008), the Supreme Court considered a convention system resembling one of the alternatives available to the plaintiffs in this case.[14]  The plaintiffs in Lopez Torres challenged New

---

[13] Plaintiffs do not advance any argument that the petitioning process was "irrational."; nor do plaintiffs contend that the petitioning process is discriminatory.  See New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 203 (2008).

[14] The court recognizes that there are several differences between the convention system in Lopez Torres, and the convention system here.  In the former, which involved the election of trial court judges, the system involved a three-part scheme:

> During the first phase, the State holds a primary election at which rank-and-file party members elect judicial delegates. . . . Next, those delegates attend a convention at which they select their party's nominees. . . . The individual so chosen automatically receives a place on the general election ballot. . . . Last, the State holds a general election at which Justices are elected.

Lopez Torres, 462 F.3d at 172 (internal citations omitted).

(cont.)

York's "delegate primary" convention system, in which each party nominated a single candidate to run for each judicial seat. Id. at 200–01. Following an unsuccessful effort to seek the party's nomination, they brought a First Amendment claim alleging deprivations of their rights to ballot access and political association. Id. at 201. The Supreme Court unanimously rejected these claims and determined that the plaintiffs' real complaint was that the election process did not give them a realistic chance to secure the party's nomination. Id. at 204–05 (noting that none of the Supreme Court's precedent establishes a constitutional right to a "fair shot" at winning a party's nomination). The Court recognized that convention systems may be unfavorable to insurgents (who lack the support of the party leadership) but it clearly held that such criticism could not support a constitutional challenge:

> To be sure, we have, as described above, permitted States to set their faces against "party bosses" by requiring party-candidate selection through processes more favorable to insurgents, such as primaries. But to say that the State can require this is a far cry from saying that the Constitution demands it.

Id. at 205. See also id. at 206–07 ("Selection by convention has been a traditional means of choosing party nominees. While a State may determine it is not desirable and replace it, it is not unconstitutional.").

Applying LaRouche's "totality approach" here, and guided by the Supreme Court's holding in Lopez Torres, the court concludes that Connecticut's ballot access

---

Here, by contrast, in Connecticut, town committees and caucuses select the delegates to nominating conventions for state and district offices. See Conn. Gen. Stat. §§ 9-390, 9-391. In addition, individuals receiving the party's endorsement at the nominating convention do not automatically appear on the general election ballot. Instead, a challenger meeting either of the two other avenues of ballot access requires that the endorsed candidate must run in, and win, the primary election. See Conn. Gen. Stat. § 9-400.

The court concludes that these are not differences that lessen the applicability of Lopez Torres to this case.

laws withstand scrutiny in the context of this Motion for Preliminary Injunction.  As noted above, Connecticut provides several avenues of ballot access.  The Lopez Torres held that one of these avenues—selection by convention—is constitutional.[15]   See 552 U.S. at 206-207.  Connecticut has two alternative methods to ballot access, and plaintiffs contend that one of these alternatives is unconstitutional.  However, because selection by convention is adequate standing alone, and because the other alternatives provide additional means of accessing the same ballot, the court views these alternatives—including the petitioning process—as "broadening the opportunities for ballot access and [are] a fortiori constitutional."  LaRouche, 990 F.2d at 39.  When considering the ballot access laws in totality, the different avenues available to the plaintiffs, and the

---

[15] The court recognizes that this conclusion conflicts with the holding of Campbell v. Bysiewicz, 213 F. Supp. 2d 152 (D. Conn. 2002), wherein the District Court held that Connecticut's "15%-delegate-vote" rule, then the only avenue to challenging the party-endorsed candidate in the primary, unconstitutionally burdened plaintiffs' First Amendment Rights. Plaintiffs' rely heavily on Campbell and contend that they are likely to succeed on the merits because "[t]his case is essentially indistinguishable." Pl. Mem. at 2.

Campbell is not binding on this court, and its holding is called into question by Lopez Torres, in which the Supreme Court, six years after Campbell, held that selection by convention is constitutional. 552 U.S. at 206; compare Campbell, 213 F. Supp. 2d at 157 ("This system has systematically denied Connecticut voters over the last 47 years a direct primary for district and state offices to an extent that clearly suggests that the 15%-delegate-vote rule far exceeds a means to a legitimate end."); with Lopez Torres, 552 U.S. at 205 ("To be sure, we have, as described above, permitted States to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries.  But to say that the State can require this is a far cry from saying that the Constitution demands it.").  Moreover, Campbell focused exclusively on Connecticut's 15%-delegate-vote rule and did not consider whether selection by endorsement provided a constitutionally adequate alternative.  See LaRouche, 990 F.2d at 39.

At oral argument, counsel for the plaintiffs asserted that Campbell remains good law and that Lopez Torres' holding applies to states which provide for convention systems only, not to states like Connecticut, which supplement its convention system with the possibility of primary elections.  However, plaintiffs provide no basis to support this limited reading of Lopez Torres, which clearly held that selection by convention is constitutional.

The court sees no reason why the possibility of a primary election following the convention would alter the Supreme Court's holding that the first avenue, selection by convention, is constitutional. Because selection by convention is constitutional, it is appropriate to consider it under LaRouche's "totality approach."

important modifications made to the complained-of petitioning process, the court concludes that plaintiffs have failed to show a likelihood of success on the merits that their rights have been severely burdened.

2.      The State's Asserted Interests

Because Connecticut's ballot access laws, as modified by Executive 7LL, do not impose a severe burden on plaintiffs' rights, the court proceeds using the Anderson-Burdick balancing test: the court balances plaintiffs' asserted First Amendment injuries against the "precise interests put forward by the State as justifications for the burden imposed by its rule." Yang, 2020 WL 2820179, at *6. "Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." Price v. Bd. of Elections, 540 F.3d 101, 109 (2008) (citing Burdick, 504 U.S. at 435).

In their Response and at oral argument, defendants have asserted several important state interests.[16]   The state has an important interest in ensuring that candidates appearing on the ballot have a "significant modicum of support." Jenness v. Fortson, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot.").   The state's signature

---

[16] At oral argument and in its Memorandum in Opposition (Doc. No. 29), the Democratic State Central Committee ("DSCC") asserted its own interest in protecting its right of association and its interest in avoiding party splintering or voter confusion.  These interests are legitimate, and the Supreme Court has held that "[a] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." Lopez Torres, 552 U.S. at 202.  "These rights are circumscribed, however, when the State gives the party a role in the election process." Id; see also Cox 892 F.3d at 1078 ("The distinction between wholly internal aspects of party administration on one hand and participation in state-run, state-financed elections on the other is at the heart of this case.").  Therefore, it is the state's interests, not the interests of the DSCC, which must be served by the regulations on the petitioning avenue in this case that plaintiffs argue burdens their First Amendment rights.

requirement, reduced by Executive Order from 5% to 3.5%, undoubtedly serves this important state interest.  See Prestia v. O'Connor, 178 F.3d 86, 88–89 (2d Cir. 1999) (upholding the constitutionality of a 5% signature ballot access requirement as a reasonable requirement that furthered the important state interest in assuring that a candidate has a significant modicum of support).  The reduction reasonably reflects the difficultly of petitioning during the COVID-19 pandemic, the state's judgment being that, under the difficult COVID-19 circumstances, a petitioning requirement of 3.5% of the district's party members, with signatures collected under the modified requirements of Executive Order 7LL, will be evidence of the existence of a modicum of support.

The state also has an interest in the orderly and efficient administration of elections, Clements v. Fashing, 457 U.S. 957, 965 (1982), an interest clearly served by the petitioning deadlines, see Thompson v. Dewine, No. 20-3526, 2020 WL 2702483, at *5 (6 Cir. May 26, 2020) ("[T]he deadlines allow them time to verify signatures in an orderly and fair fashion, while also providing initiative proponents time to challenge any adverse decision in court.").  The court recognizes that any deadline would impose some burden on the plaintiffs.  However, that burden must be weighed against the state's strong interest in the orderly administration of the August primary election.  For the 2020 primary, military and overseas ballots must be sent out by the town clerks by June 27, only 16 days after the extended deadline to submit petitions.  See Conn. Gen. Stat. § 9-158c.  In light of the time pressure on the state, and considering the impact that COVID-19 has undoubtedly had on the Secretary of State's office and the offices of the town clerks, the Governor's limited extension of the petitioning deadline was reasonable.

For these reasons, the court concludes that the state's interest in maintaining these deadlines for an orderly election outweighs the burdens they impose on the plaintiffs.  The court will not, as plaintiffs request, extend the deadline to July 15, 2020—18 days <u>after</u> the statute requires town clerks to send out the military and overseas ballots.  <u>See</u> Mot. at 3; <u>see also</u> <u>Thompson v. Dewine</u>, No. 20-3526, 2020 WL 2702483, at *6 (6th Cir., May 26, 2020) ("Rewriting a state's election procedures or moving deadlines rarely ends with one court order.  Moving one piece on the game board invariably leads to additional moves.").

All election laws impose some burden on voters and candidates.  <u>Burdick</u>, 504 U.S. at 434.  Here, Connecticut's petitioning requirements certainly impose some burdens on plaintiffs' First Amendment rights.  However, when viewing Connecticut's overall electoral scheme and its various avenues to primary ballot access, and when weighing plaintiffs' less-than-severe burden against these important state interests, the court concludes, on the record before it, that Connecticut's election laws, as modified by Executive Order 7LL, are reasonable and non-discriminatory and do not unconstitutionally burden plaintiffs' rights.  The state's regulations serve important regulatory interest and justify these reasonable, nondiscriminatory restrictions.  <u>See</u> <u>Clingman</u>, 544 U.S. at 586–87.  Plaintiffs have failed to demonstrate a likelihood of success on the merits, let alone a clear or substantial likelihood of success.[17]

---

[17] Because plaintiffs have failed to demonstrate a clear or substantial likelihood of success on the merits, the court does not consider whether they have satisfied the other requirements for a preliminary injunction.

## V.    CONCLUSION

For the reasons stated above, plaintiffs' Motion for Preliminary Injunction (Doc. 9) is denied.

**SO ORDERED.**

Dated this 8th day of June 2020 at New Haven, Connecticut.


　　　　　　　　　　　  /s/ Janet C. Hall
　　　　　　　　　　　 Janet C. Hall
　　　　　　　　　　　 United States District Judge