**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANDY GOTTLIEB, ET AL., | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:20-CV-00623 (JCH) |
| v. | : | |
| | : | |
| NED LAMONT ET AL., | : | |
| Defendants. | : | FEBRUARY 8, 2022 |
| | : | |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. NO. 69, 72), DEFENDANTS' MOTION TO EXCLUDE (DOC. NO. 66), PLAINTIFFS' MOTION TO EXLUDE (DOC. NO. 74), PLAINTIFFS' MOTION TO ADD PARTY PLAINTIFF (DOC. NO. 79), AND PLAINTIFFS' MOTION FOR LEAVE TO FILE EXCESS PAGES (DOC. NO. 68)**

## I.    INTRODUCTION

Plaintiffs Andy Gottlieb, Lorna Chand, and Jason W. Bartlett bring this action against Governor Ned Lamont, Secretary of State Denise Merrill (the "State defendants"), and intervenor-defendant Democratic State Central Committee ("DSCC"), alleging that Connecticut's ballot access laws for party primaries are unconstitutional under the First and Fourteenth Amendments.  Compl. at ¶ 34.  Pending before the court are six separate Motions, including the parties' cross-Motions for Summary Judgment. This Ruling resolves all six of these Motions.

First, plaintiffs and State defendants have each moved to exclude expert testimony proffered by the other side.  Defendants seek to exclude the expert testimony of plaintiff Gottlieb.  See State Defs.' Mot. to Exclude the Expert Test. of Andy Gottlieb (Doc. No. 66); State Defs.' Mem. in Supp. of Their Mot. to Exclude the Expert Test. of Andy Gottlieb ("State Defs.' Mot. to Exclude Gottlieb Test. Mem.") (Doc. No. 66-1); State Defs.' Reply Mem. in Supp. of Their Mot. to Exclude the Expert Test. of Andy Gottlieb

1

("State Defs.' Mot. to Exclude Gottlieb Test. Reply") (Doc. No. 70).  Plaintiffs have

opposed this Motion.  <u>See</u> Pls.' Objection to State Defs.' Mot. to Exclude Expert Test. of

Andy Gottlieb ("Pls.' Mot. to Exclude Gottlieb Test. Opp'n") (Doc. No. 67).  They also, in

turn, have moved to exclude what they argue is the expert testimony brought forth by

the State Defendants in the form of sworn declarations by Theodore E. Bromley and

Thomas McDonough.  <u>See</u> Pls.' Mot. to Exclude Expert Test. of Theodore Bromley and

Thomas McDonough ("Pls.' Mot. to Exclude Bromley and McDonough Test. Mem.")

(Doc. No. 74).  The State defendants oppose this Motion.  <u>See</u> State Defs.' Opp'n to

Pls.' Mot. to Exclude Expert Test. of Theodore Bromley and Thomas McDonough

("State Defs.' Mot. to Exclude Bromley and McDonough Test. Opp'n") (Doc. No. 76).

Second, after the cross-Motions for Summary Judgment were joined, plaintiffs

moved to add an additional party as a plaintiff to this action.  <u>See</u> Pls.' Rule 21 Mot. to

Add Party Pl. ("Pls.' Mot. to Add Party Mem.") (Doc. No. 79).  Both the State defendants

and the DSCC have opposed this Motion.  <u>See</u> State Defs.' Opp'n to Pls.' Rule 21 Mot.

to Add Party ("State Defs.' Mot. to Add Party Opp'n") (Doc. No. 80); DSCC Mem. in

Opp'n to Pls.' Mot. to Add Party ("DSCC Mot. to Add Party Opp'n") (Doc. No. 81).

Third, plaintiffs and State defendants have cross-moved for summary judgment.

<u>See</u> Pls.' Mot. for Summ. J. (Doc. No. 69); State Defs.' Cross-Mot. for Summ. J. and

Opp'n to Pls.' Mot. for Summ. J. (Doc. No. 72).  Both have filed Memoranda in support

of their position. <u>See</u> Mem. of Law in Supp. Of Pls.' Mot. for Summ. J. ("Pls.' Mot. for

Summ. J. Mem.") (Doc. No. 69-1); Pls.' Reply of Cross-Mots. for Summ. J. ("Pls.' Mot.

for Summ J. Reply") (Doc. No. 75); State Defs.' Mem. of Law in Supp. of Their Cross-

Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. ("State Defs.' Mot. for Summ.

J. Mem.") (Doc. No. 72-1); State Defs.' Reply Mem. of Law in Supp. of Their Cross-Mot. for Summ. J. ("State Defs.' Mot. for Summ. J. Reply") (Doc. No. 77).[1]

Finally, in support of their Motion for Summary Judgment, plaintiffs have moved for leave to file excess pages for their Local Rule 56(a)1 Statement. See Pls.' Mot. for Permission to File Oversized Local R. 56(a)1 Statement of Material Facts (Doc. No. 68). That Motion is unopposed.

For the reasons discussed below, the court: (1) grants the State defendants' Motion to Exclude the Expert Testimony of plaintiff Gottlieb; (2) grants in part and denies in part plaintiffs' Motion to Exclude the Expert Testimony of Bromley and McDonough; (3) denies plaintiffs' Motion to add a party plaintiff; (4) denies plaintiffs' Motion for Summary Judgment; (5) grants State defendants' Motion for Summary Judgment, and; (6) grants plaintiffs' Motion for Leave to File Excess Pages.

## II.    FACTS

In their Second Amended Complaint, plaintiffs bring a single Count against defendants, alleging that Connecticut's laws for accessing the ballot for party primaries unduly burden their rights under the First and Fourteenth Amendment. See Second Am. Class Action Compl. for Decl. & Inj. Relief at ¶¶ 33-35 ("Compl.") (Doc. No. 51).[2] They seek various declaratory and injunctive remedies, including enjoining Connecticut's primary ballot access laws to allow plaintiffs to begin petitioning for ballot

---

[1] Intervenor-defendant DSCC has not moved for summary judgment, but has "adopt[ed] the position and arguments set forth" by the State defendants in their Memoranda. See Adoption of Def. State of Connecticut's Cross-Mot. for Summ J. and Opp'n to Pls.' Mot. for Summ. J. (Doc. No. 73).

[2] Plaintiffs subsequently dropped their class allegations and represented to the court that the case would proceed only as to the named plaintiffs. See Minute Entry (Doc. No. 56).

access on the first business day of 2022.  See Compl. at 8-9; Pls.' Mot. for Summ. J. Mem. at 40.

Plaintiffs are Connecticut voters, former candidates for public office, and – in the case of plaintiff Gottlieb – a candidate for state representative in 2022.  See Pls.' Request for Judicial Notice (Doc. No. 82) (notifying the court that Gottlieb has declared his candidacy for the 2022 election cycle).  Gottlieb also ran for state senate in 2018, but fell short of accessing the primary ballot by 32 signatures.  See Pls.' R. 56(a)1 Statement of Material Facts at ¶ 117 ("Pls.' R. 56(a)1 Stmt") (Doc. No. 69-2); State Defs.' R. 56(a)2 Statement of Material Facts at ¶ 117 ("State Defs.' R. 56(a)2 Stmt") (Doc. No. 72-4).  In 2020, plaintiff Bartlett ran for state senate as well.  Pls.' R. 56(a)1 Stmt at ¶ 120; State Defs.' R. 56(a)2 Stmt at ¶ 120.  He also fell short of accessing the primary ballot.  Pls.' R. 56(a)1 Stmt at ¶¶ 132-33; State Defs.' R. 56(a)2 Stmt at ¶¶ 132-33.  Both Gottlieb and Bartlett had collected enough raw signatures during their campaigns to qualify for the primary ballot; however, both had signatures excluded because of various deficiencies, causing them to drop below the threshold for ballot access.  Pls.' R. 56(a)1 Stmt at ¶¶ 117, 132-33; State Defs.' R. 56(a)2 Stmt at ¶¶ 117, 132-33.  Plaintiff Chand served as Gottlieb's treasurer during his 2018 campaign and alleges that she was prevented from voting for Gottlieb, her candidate of choice, in the 2018 primary because of Connecticut's overly restrictive primary ballot access laws. Compl. at ¶ 8.

The ballot access laws for state senate and other district offices that plaintiffs challenge provide candidates with three avenues to appear on the ballot for party primaries:

> First, a candidate can receive the endorsement of the party at the party convention. For candidates that do not receive the endorsement, section 9-400 of the Connecticut General [Statutes] provides two additional avenues: (1) by receiving at least 15% of the delegate vote at a convention held by that political party; or (2) by circulating a petition and obtaining the signatures of five percent of the enrolled members of the party in the district. See Conn. Gen. Stat. § 9-400(b). This second option, the petitioning process, was added by the Connecticut legislature by Public Act 03-241, effective January 1, 2004.

Gottlieb v. Lamont, 465 F. Supp. 3d 41, 45 (D. Conn. 2020); see also State Defs.' Local R. 56(a)1 Statement of Undisputed Material Facts at ¶¶ 140, 157 ("State Defs.' R. 56(a)1 Stmt") (Doc. No. 72-2); Pls.' Local R. 56[(a)2] Statement of Additional Material Facts at ¶¶ 140, 157 ("Pls.' R. 56(a)2 Stmt") (Doc. No. 75-1).[3] Candidates for these district offices that attempt to access the ballot through petitioning are given only 14 days to collect the signatures of five percent of the enrolled party members in their district. State Defs.' R. 56(a)1 Stmt at ¶ 161; Pls.' R. 56(a)2 Stmt at ¶ 161. For state-wide offices – such as Governor, U.S. Senator, etc. – and U.S. congressional offices, candidates have 42 days to collect the signatures of two percent of the party members in the state or their congressional district. State Defs.' R. 56(a)1 Stmt at ¶¶ 156, 161; Pls.' R. 56(a)2 Stmt at ¶¶ 156, 161. However, because these areas are much larger than the ones for district office that require five percent, the lower two percent threshold

---

[3] Although plaintiffs do not dispute the statutory process for appearing on a primary ballot, they contend that there are only two avenues, not three. See Pls.' R. 56(a)2 Stmt at ¶ 140. Because "any candidate who has more than 15% of delegates has access", and the candidate endorsed by the party will inevitably have more than 15% of the delegates, they argue that "[p]arty endorsement [itself] is not an avenue to ballot access." Id. To a large extent, this is a distinction without a difference. However, to the extent that it is material, plaintiffs' argument fails to recognize that the Connecticut General Statutes clearly delineate the process for securing a spot on a primary ballot into three distinct avenues. Section 9-382 of the Connecticut General Statutes provides the manner in which a party at its convention shall "choose a candidate for nomination." Conn. Gen. Stat. § 9-382. "No such convention shall choose more than one candidate for nomination to any such office." Id. Section 9-400 then goes on to describe the two alternative avenues – securing 15% of the delegate vote or petitioning. Conn. Gen. Stat. § 9-400. Thus, because the statutes themselves describe three avenues for accessing a party's primary ballot, the court uses that framework as well.

translates into a greater number of total signatures that candidates for those positions are required to obtain in order to access the primary ballot through the petitioning avenue.  State Defs.' R. 56(a)1 Stmt at ¶ 181; Pls.' R. 56(a)2 Stmt at ¶ 181.

In 2020, these requirements were relaxed due to the ongoing COVID-19 pandemic.  See generally, Gottlieb, 465 F. Supp. 3d at 45-46.  Governor Lamont issued an Executive Order that "extended the deadline to submit petitions by two days"; eliminated the in-person signature requirement; and reduced the required number of signatures to petition on to the primary ballot by thirty percent.  Id.  Those modifications applied only to "the primary . . . elections conducted in 2020", and there is nothing in the record indicating that, despite the recent spike in cases and deaths across the country and in Connecticut due to the Omicron variant, Governor Lamont is considering similar modifications for the 2022 primaries.  See Executive Order 7LL; Tracking Coronavirus in Connecticut, N.Y. Times (last accessed Feb. 8, 2022), https://www.nytimes.com/interactive/2021/us/connecticut-covid-cases.html.

## III.   PROCEDURAL HISTORY

It was against this backdrop that plaintiffs first filed this case in 2020.  A day after Governor Lamont issued his Executive Order, plaintiffs moved for an emergency injunction to, inter alia, lower "the signature requirement to one percent of the registered party members in [a given] district and . . . [extend] the deadline" to file those signatures for an additional 34 days.[4]  Gottlieb, 465 F. Supp. 3d at 44; Pls.' Mot. for Prelim. Inj. or Permanent Inj. And Decl. Relief (Doc. No. 9).  Their Motion was limited to an "as

---

[4] At this point, Richard Lacourciere was also a plaintiff-party to this action.  Gottlieb, 465 F. Supp. 3d at 44.  He was a candidate for the Connecticut General Assembly at the time.  Id.  However, Lacourciere was no longer included as a plaintiff when plaintiffs amended their Complaint.  See Compl. at ¶¶ 7-11 (listing the parties to the action and omitting Lacourciere).

applied" challenge to Connecticut's primary ballot access laws, and "contend[ed] that, because of the [other] restrictions [the state had] put in place in response to the COVID-19 pandemic, [those laws] impose[d] an unconstitutional burden, even as amended by Executive Order 7LL."[5]  Gottlieb, 465 F. Supp. 3d at 44.

The court denied plaintiffs' Motion on June 8, 2020, concluding that the plaintiffs had "fail[ed] to demonstrate a clear or substantial likelihood of success on the merits." Id. at 47.  In doing so, the court first observed that "ballot access laws 'place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'"  Id. (quoting William v. Rhodes, 393 U.S. 23, 30-31 (1968)).  Given that "'laws that affect candidates always have at least some theoretical, correlative effect on voters'", the court proceeded to analyze the "rights asserted by the candidate-plaintiffs and the voter-plaintiff" together, as their claims "'[did] not lend themselves to neat separation.'"  Id. (quoting Anderson v. Celebrezze, 460 U.S. 780, 786 (1983)).

Next, the court conducted the two-step Anderson-Burdick inquiry, see infra Section VI.  At step one, it concluded that "plaintiffs ha[d] not [ ] made a clear showing . . . [of] likelihood of success on the merits" as to demonstrating that Connecticut's petitioning requirements for primary ballot access, as amended by Governor Lamont's Executive Order, posed a "severe burden."  Id. at 51.  It also noted that, even if it had

---

[5] The operative Complaint here alleges that those same laws – in the absence of any modifications to account for COVID-19 – are unconstitutional both facially and as applied.  See Compl. at 8.  When plaintiffs moved for the preliminary injunction, however, that Motion was "not a facial challenge" but rather was limited to challenging "the petition signature requirements . . . as applied . . . in light of the circumstances created by the COVID-19 pandemic."  Gottlieb, 465 F. Supp. 3d at 44, 46 n. 3.

found that plaintiffs were likely to demonstrate such a "severe burden", that "conclusion would not be dispositive" of the first Anderson-Burdick inquiry.  Id.  This was because, even though plaintiffs had focused their Motion on the petitioning process, "it [was] well-settled that, at Anderson-Burdick's first step, '[t]he burden imposed by the challenged regulation is not evaluated in isolation, but within the context of the state's overall scheme of election regulations.'"  Id. (quoting Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 145 (2d Cir. 2000).  In the broader context of the state's three-avenue primary ballot access scheme, the Supreme Court's decision in New York State Bd. Of Elections v. Lopez Torres, 552 U.S. 196 (2008), held that "one of [those] avenues – selection by convention – [was] constitutional . . . standing alone."  Id. at 53-54 (emphasis added).  Thus, under Lopez Torres, plaintiffs had failed to show a likelihood of success on the merits because the convention selection system was constitutional by itself, and the other two avenues – receiving 15% of the delegate vote and petitioning – must therefore be viewed as "'broadening the opportunities for ballot access" and as "a fortiori constitutional."  Id. at 54 (quoting LaRouche v. Kezer, 990 F.2d 36, 39 (2d Cir. 1993)).

At the second step of the Anderson-Burdick inquiry, the court "conclude[d] that the state's interest in maintaining [petition] deadlines . . . outweigh[ed] the burdens [those deadlines] impose[d] on plaintiffs."  Id. at 55.  Because "[t]he state's regulations serve[d] important regulatory interest[s] and justif[ied] the[ ] reasonable, nondiscriminatory restrictions" on primary ballot access, plaintiffs had "failed to demonstrate a likelihood of success on the merits, let alone a clear or substantial likelihood of success."  Id.  The Motion was accordingly denied.

The court was careful, however, to limit its analysis to plaintiffs' likelihood of success in challenging Connecticut's ballot access laws <u>as amended</u> by Governor Lamont's Executive Order.  <u>Id.</u> at 50 ("[h]ad the Governor failed to modify the election laws during this public health emergency, plaintiffs' claim of severe burden would have had much greater force. But that is not the case").  Here, as the court assesses the parties' cross-motions for summary judgment following discovery, no such Executive Order is in place for the 2022 elections.

Below, the court first addresses the parties' two Motions to Exclude and plaintiffs' Motion to add an additional plaintiff to this case.  After ruling on those motions, it turns to the cross-motions for summary judgment.

## IV.   MOTIONS TO EXLUDE

State defendants have moved to exclude the expert testimony of plaintiff Gottlieb, who has prepared a report comparing primary ballot access laws across the fifty states. <u>See</u> State Defs.' Mot. to Exclude Gottlieb Test. Mem. at 2 (citing Andy Gottlieb, <u>Ballot Access Report</u> ("Gottlieb Report") (Doc. No. 66-4).  They argue, <u>inter alia</u>, that Gottlieb is not qualified to present expert testimony on ballot access laws.  <u>Id.</u> at 13-16. Plaintiffs, in turn, have moved to exclude what they argue is the expert testimony of two of the State defendants' declarants, Bromley and McDonough.  <u>See</u> Pls.' Mot. to Exclude Bromley and McDonough Test. Mem. at 1-2 (citing Decl. of Theodore E. Bromley, State Defs.' Ex. 7 (Doc. No. 72-3); Decl. of Thomas McDonough, State Defs.' Ex. 8 (Doc. No. 72.3)).  They argue that the State defendants failed to disclose this testimony in accordance with this court's scheduling order.  The court first sets out the standard for admitting expert testimony, before analyzing each Motion.

A.     Standard

Federal Rule of Civil Procedure 26(a)(2)(D) requires parties to disclose their

expert witnesses "at the times and in the sequence that the court orders."  Fed. R. Civ.

P. 26(a)(2)(D).  If a party "fails to . . . identify a witness as required by Rule 26(a) . . .

th[at] party is not allowed to use that . . . witness to supply evidence on a motion . . .

unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  A

district court may also consider other remedies, however, since "[p]recluding evidence is

a drastic remedy that should be exercised with caution."  Colon v. Lunchip Logistics

LLC, 330 F.R.D. 359, 366 (E.D.N.Y. 2019) (internal quotations and citations omitted);

see also Fed. R. Civ. P. 37(c) (providing that "[i]n addition to or instead of this sanction,

the court . . . may impose other appropriate sanctions").  Here, State defendants do not

argue that they disclosed Bromley and McDonough as expert witnesses before the

deadline to do so.  They contend instead that the two are "fact witnesses, not experts",

and therefore are not subject to the strict disclosure rules related to experts.  State

Defs.' Mot. to Exclude Bromley and McDonough Test. Opp'n at 1.  "[T]o the extent that

the declarants did offer opinions", they argue, "they were made pursuant to Federal

Rules of Evidence Rule 701."

The distinction between a lay and an expert witness is well-established.  The

former "may testify to a matter only if evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602

(emphasis added); see also East Point Systems, Inc. v. Maxim, No. 3:13-CV-00215,

2015 WL 8023569, at *3 (D. Conn. Dec. 4, 2015) ("if Plaintiffs [can] demonstrate that

[the proposed witness] has personal knowledge . . . [he] will be permitted to testify only

about his personal knowledge").  "Unlike an ordinary witness . . . an expert is permitted

10

wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.  Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of [their] discipline."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993).  Where lay witnesses offer opinions, on the other hand, they are limited to "one[s] that [are] . . . (a) rationally based on the witness's perception; (b) helpful to clearly understand the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Thus, in distinguishing a lay witness from an expert witness, a court's primary focus is on whether their testimony is based on their personal knowledge.

In addition, a person must meet certain requirements to testify as an expert. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if", inter alia, their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  In other words, before an individual may proffer expert testimony, a "court must decide whether the witness called is properly qualified to give the testimony sought."  Lappe v. Am. Honda Motor Co., Inc., 857 F. Supp. 222, 226 (N.D.N.Y. 1994), aff'd 101 F.3d 682 (2d Cir. 1996); see also Hernandez v. Pitco Frialator, Inc., No. 15-CV-01079, 2019 WL 12345496, at *11 (W.D.N.Y. Oct. 28, 2019) (Rule 702 "requires the district court make several determinations prior to allowing expert testimony, including whether [ ] the witness is qualified to be an expert").  "A district court judge has wide discretion in

determining the qualifications and competency of a witness to express an opinion as an expert." U.S. v. Bermudez, 526 F.2d 89, 98 (2d Cir. 1975). Although "[l]iberality and flexibility in evaluating qualifications should be the rule", and "the proposed expert should not be required to satisfy an overly narrow test of his own qualifications", the expert still must "be educated and experienced enough to make himself an expert regarding the [issue] in question." Lappe, 857 F. Supp. at 227; Valente v. Trextron, Inc., 931 F. Supp. 2d 409, 431 (E.D.N.Y. 2013) (internal quotations and citations omitted).

       B.     Bromley and McDonough

In response to plaintiffs' Motion to Exclude the expert testimony of Bromley and McDonough for failure to disclose, State defendants make two arguments. First, they contend that "most of the challenged statements are factual assertions, not opinions." State Defs.' Mot. to Exclude Bromley and McDonough Test. Opp'n at 2. "Second, to the extent that [they] are offering opinions, they [are] do[ing] so as lay witness[es] pursuant to [Rule 701]." Neither of these arguments is availing.

First, significant portions of the Bromley and McDonough declarations purport to offer opinions. For instance, in Section II of his Declaration, Bromley extrapolates from the data available to him regarding plaintiff Bartlett's 2020 campaign and past political experience to opine that he "could [garner political support] for any primary petition drive." Decl. of Theodore E. Bromley at ¶ 28. This is in part because it is "readily apparent" to Bromley "that Mr. Bartlett has significant . . . support from . . . the Democratic Party." Id. at ¶ 29. This continues in the "Signature Gathering Requirements" section of the Declaration. Although Bromley says that the opinions expressed therein are "[b]ased on [his] experience", they quite plainly are not. Id. at ¶ 49. Indeed, all his conclusions regarding the amount of time and number of personnel

required to reach the signature thresholds in a campaign are based on the Affidavit of Tawana Galberth, which plaintiffs submitted earlier in this litigation in support of their Motion for a Preliminary Injunction.  See id. at ¶¶ 55-56.  There is no indication that his subsequent conclusion that "a state candidate should easily be able to organize" and meet the signature requirements "if they have even modest support" is based on anything within his personal experience.  Id. at ¶ 58.  Similarly, McDonough's Declaration is replete with opinions regarding the effects plaintiffs' requested relief would have on party unity and the best strategies for candidates to get on the ballot. Decl. of Thomas McDonough at ¶¶ 15-17, 20-22.  These conclusions appear to be based on his expertise gained through more than ten years serving as Chair of the Rules Committee of the Connecticut Democratic Party, as well as his participation in "numerous conventions (national, state and legislative)" and prior service for more than a decade on the Democratic National Convention Rules Committee.  Id. at ¶ 5.

Second, the opinions the two declarants offer do not meet the Rule 701 criteria for admissible opinions from lay witnesses.  "Rule 701 requires lay opinion testimony to be based on the witness's personal perceptions."  U.S. v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005).  In this way, the rule "represents no departure" from Rule 602.  Id.  "Rather, Rule 701 simply recognizes lay opinion as an acceptable shorthand for the rendition of facts that the witness personally perceived."  Id. (internal quotations and citations omitted).  Bromley's Declaration at points clearly runs afoul of this Rule: he draws conclusions not based on his own experiences, but on the experiences of another affiant.  When an "opinion [is] not limited to [the witness'] personal perception but

dr[aws] on the total information" gathered by other persons, that opinion is not properly admitted under Rule 701.  Id. at 212.

Similarly, the opinions discussed above that McDonough expresses in his Declaration are not admissible under Rule 701 because they are "not based entirely on [his] perceptions", but rather are "based on [his] experience and specialized knowledge in [party primary and convention rules]."  Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2004).  In Bank of China, the district court admitted testimony under Rule 701 from one of the bank's employees after finding it "admissible based on his many years of experience in international banking and trade."  Id. at 180. The Second Circuit reversed, finding that the district court had abused its discretion by admitting the employee's testimony, because Rule 701 "explicitly bars the admission of lay opinions that are 'based on scientific, technical, or other specialized knowledge withing the scope of Rule 702.'"  Id. at 181 (quoting Fed. R. Evid. 701(c)).  Here, as was the case in Bank of China, McDonough's testimony – and the opinions he expresses therein related to how candidates can best access the ballot and the impact a change in the rules would have on party unity – are entirely based on his extensive background and experience in these areas.  When such testimony is "rooted exclusively in [the witness'] expertise" in the subject area, it is not admissible under Rule 701.  Thus, the court concludes that portions of both Bromley and McDonough's testimony constituted opinions not admissible under Rule 701.

That is not, however, dispositive of the question of whether Bromley and McDonough's testimony should be excluded, in whole or in part.  "When evaluating whether testimony should be precluded under Rule 37 for failure to disclose under Rule

26(a), [courts] consider four factors."  <u>Chamberlain Estate of Chamberlain v. City of White Plains</u>, 960 F.3d 100, 117 (2d Cir. 2020).  These factors, commonly known as the <u>Softel</u> factors, are:

> '(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'

<u>Id.</u> (quoting <u>Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.</u>, 118 F.3d 955, 961 (2d Cir. 1997).  Here, State defendants did not disclose Bromley and McDonough for the simple reason that they did not believe them to be experts, although they did disclose to plaintiffs that an election official would be their main witness.  State Defs.' Mot. to Exclude Bromley and McDonough Test. Opp'n at 11-12.  While parts of the testimony of their two declarants are crucial to the State defendants' Motion, the portions of that testimony that the court has identified as diverging from fact-based, lay witness testimony into Rule 702, expert testimony is not.  <u>Id.</u> at 13 ("[t]o preclude <u>the entirety</u> of Mr. Bromley's and Mr. McDonough's declarations would prevent State Defendants from adequately arguing their case for summary judgment") (emphasis added).  And, although plaintiffs would be prejudiced by the introduction of Bromley and McDonough's expert testimony, it is difficult to see how they would be prejudiced if that testimony was limited to factual information within the personal knowledge of the declarants.  This includes Bromley's statements in Section VI of his Declaration regarding the State's interest in promulgating rules to ensure "orderly, fair, and transparent elections."  Decl. of Theodore E. Bromley at ¶ 61.  Finally, as to the fourth <u>Softel</u> factor, the court is disinclined to continue these proceedings given that the 2022 primary elections are fast

approaching and plaintiffs' requested relief would, if granted, permit them to begin collecting signatures the moment this Ruling is issued.

Thus, taken together, the <u>Softel</u> factors counsel towards excluding only the testimony from Bromley and McDonough, including the testimony identified above, <u>see supra</u> at 12-13, that could only be admitted pursuant to Rule 702.  <u>See, e.g.</u>, <u>Bank of China</u>, 359 F.3d at 181-82 (distinguishing between the portions of the bank employee's testimony that were admissible under Rule 701 and the portions admissible only under Rule 702, and concluding that "to the extent [his] testimony . . . reflected specialized knowledge . . . its admission pursuant to Rule 701 was in error").  Plaintiffs' Motion to Exclude is therefore granted in part and denied in part, and the testimony of Bromley and McDonough is admitted only to the extent that it does not constitute expert testimony under Rule 702.

C.    <u>Gottlieb</u>

State defendants have moved to exclude the expert testimony of plaintiff Gottlieb, arguing, <u>inter alia</u>, that he is not qualified to testify as an expert in this matter.  The court agrees.

An individual must "be educated and experienced enough to make himself an expert regarding the [issue] in question."  <u>Valente</u>, 931 F. Supp. 2d at 431 (internal quotations and citations omitted).  In determining whether a witness is qualified to testify as an expert, courts ask "whether the proffered expert has the educational background or training in [the] relevant field . . . by looking at the totality of the witness's background."  <u>I.M. v. United States</u>, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal quotations and citations omitted).  Where courts in this Circuit have found a person qualified to serve as an expert on a particular matter, they have generally done so

because that person has some combination of advanced education, practical or academic experience, or a professional license in the field in question.  See, e.g., Tardif v. City of New York, 344 F. Supp. 3d 579, 597-98 (S.D.N.Y. 2018) (expert "just barely" qualified to testify on PTSD when he was a licensed psychologist with a doctoral degree practicing in a supervisory capacity and had "some experience treating individuals with PTSD", but there was a lack of information in the record regarding his "qualifications to diagnose mental conditions" that "left something to be desired"); In re Namenda Indirect Purchaser Antitrust Litigation, 338 F.R.D. 527, 545 (S.D.N.Y. 2021) (economist with a PhD who had served as an Associate Professor at two universities and as a Senior Economist at RAND was qualified "to opine about [certain] economic factors at play" in the case); I.M., 362 F. Supp 3d at 192 (doctor qualified "to testify as a neonatology expert" when he had "practiced neonatal medicine for over 50 years, managed thousands of neonatal cases . . . [and] served as the chief of neonatal medicine at a hospital for two decades").  In contrast, where an individual falls short of this demonstrable and particularized expertise, courts have not hesitated to conclude the person is not qualified to testify as an expert.  See, e.g., Valente, 931 F. Supp. 2d at 429-30 (proffered expert witness not qualified to testify as to why a golf cart was defective despite his bachelor's degree in mechanical engineering technology when he lacked a license and therefore "by law [was] not permitted to design products or otherwise offer himself out as a mechanical engineer" and there were noted faults in his methodology); Karavitis v. Makita U.S.A., Inc., 243 F. Supp. 3d 235, 242-43 (D. Conn. 2017) (proffered expert not qualified to testify on "the safe design of circular power saws" despite undergraduate coursework in mechanical, electrical, and safety

engineering when his degree was in "Fire Protection and Safety Engineering" and his subsequent "career as a safety engineer" did "not indicate" any expertise with circular power saws).

Here, Gottlieb's qualifications and experience are much more similar to the latter group than to the former.  Gottlieb graduated from Wesleyan University in 2014 with a degree in French and a minor in Economics.  State Defs.' Ex. 1, Dep. of Andy Gottlieb at 19 (Doc. No. 66-2).  He then went directly to graduate school, attending Johns Hopkins University School of Advanced International Studies and graduating in 2016 with a Master's degree in International Relations with concentrations in American Foreign Policy and International Economics.  Id. at 21.  None of his graduate level courses focused on election law.  Id. at 23.  Nor does it appear that he pursued any study in election law at all until 2018.  That year, he took a workshop on electoral reform at Yale with former U.S. Senator Russ Feingold and ran for state senate.

According to Gottlieb, he first became interested in the issue of primary ballot access when he ran for state senate in 2018.  Id. at 55.  After his failed bid to access the ballot, he published an article in a local newspaper on the topic and, in 2020, filed this lawsuit.  Id. at 52.  Later, following the proceedings in this case related to his Motion for a Preliminary Injunction, Gottlieb "took it upon himself to do research" into comparing ballot access laws across all fifty states.  Id. at 14-15.  That research sparked the Report Gottlieb has submitted in support of plaintiffs' Motion for Summary Judgment in this case.  Aside from his personal experience running for state senate, plaintiffs concede that Gottlieb "has not held any [professional] positions before" in the area of election law.  Pls.' Mot. to Exclude Gottlieb Test. Opp'n at 5.

18

In sum, there is nothing in the record to indicate that Gottlieb possesses the requisite "knowledge, skill, experience, training, or education" to testify as an expert on primary ballot access laws specifically or election law more generally.  Fed. R. Evid. 702.  Gottlieb is clearly intelligent and well-educated.  However, admitting his report here would risk transforming any discerning individual with an unrelated Master's degree into an expert in any subject in which they take an keen interest.  The law does not support such a broad definition of expertise.  Outside of his 2018 state senate campaign and a six-week workshop on electoral reform, Gottlieb has no relevant background, education, or professional experience in the issues he seeks to testify on as an expert.  Indeed, he only began studying the subject of his Report as this case was ongoing.  Given those facts, the court cannot conclude that Gottlieb is qualified to testify as an expert here.[6]

State defendants' Motion to Exclude is therefore granted.

## V.      MOTION TO ADD PARTY PLAINTIFF

Next, following the conclusion of motion practice related to the parties' cross-Motions for Summary Judgment, plaintiffs have moved pursuant to Rule 21 to add another plaintiff to this lawsuit, Anthony DiLizia. DiLizia is running for United States Congress as a Democrat in Connecticut in 2022.  Pls.' Ex. A, Decl. of Anthony DiLizia at ¶ 1 (Doc. No. 79-1).  It appears that plaintiffs' purpose in seeking to add DiLizia is to

---

[6] Of course, this does not preclude the court from taking judicial notice of the primary ballot access laws across the country, which is the subject of Gottlieb's Report.  See, e.g., Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d 24, 27 (1st Cir. 2011) ("'[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof'") (quoting Lamar v. Micou, 114 U.S. 218, 223 (1885).  Further, as discussed in Section VI, the court would reach the same conclusions as to the parties' cross-Motions for Summary Judgment even had it admitted plaintiff Gottlieb's expert testimony.

protect against the standing arguments raised by State defendants in their Motion for Summary Judgment: at the time the Motions for Summary Judgment were joined, neither Gottlieb, Bartlett, or Chand were running for office in 2022, while DiLizia was. Plaintiff Gottlieb later announced his candidacy in 2022 as well.  See Pls.' Request for Judicial Notice.  According to plaintiffs, to the extent that this court finds "that defendants' Article III [standing] argument has merit, Mr. DiLizia's addition to the case cures any Article III defect."  Pls.' Mot. to Add Party Mem. at 2; see also id. ("[p]laintiffs contacted Mr. DiLizia shortly after State Defendants identified the Article III issue . . . in their motion for summary judgment").

Rule 21 of the Federal Rules of Civil Procedure provides that, "[o]n motion or on its own, [a] court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21.  "Under Rule 21, courts must consider judicial economy and their ability to manage each particular case, as well as how the amendment would affect the use of judicial resources, the impact the amendment would have on the judicial system, and the impact the amendment would have on each of the parties already named in the action." Davis v. City of New Haven, No. 3:11-CV-1829, 2014 WL 1315660, at *6 (D. Conn. Mar. 30, 2014) (internal quotations and citations omitted).  "However, courts are guided by the same standard of liberality afforded to motions to amend pleadings under [Rule] 15, when determining whether a plaintiff should be permitted to add parties to an action." Id. (internal quotations and citations omitted).  Thus, "[o]nce the deadline for amendment in a scheduling order has passed, leave to amend may be denied where the moving party has failed to establish good cause.  A finding of 'good cause' depends on the diligence of the moving party."  Presbyterian Church of Sudan v. Talisman

Energy, Inc., 582 F.3d 244, 267 (2d Cir. 2009) (internal quotations and citations omitted).

Here, the deadline for plaintiffs to amend their pleadings has long passed.  See Scheduling Order (Doc. No. 57) (setting the deadline for amended pleadings as November 6, 2020); Pls.' Mot. to Add Party Mem. (seeking to add a party plaintiff on November 18, 2021).  Moreover, permitting plaintiffs to add another party at this time would frustrate the interests of justice.  Discovery in this case has already been completed, and cross-Motions for Summary Judgment have been joined.  If the court were to permit DiLizia to join this case as a plaintiff, it would then have to reopen discovery to allow State defendants to depose him if they so wished, and then permit the parties to refile their Motions for Summary Judgment to account for his testimony.  Such further delay in this case is especially unwarranted given the fast-approaching 2022 primary elections.[7]  Finally, as discussed infra Section VI.A., plaintiffs will suffer no prejudice from the court denying their Motion, as the court does not believe they have a standing issue in this case.  DiLizia seeks to challenge the same primary ballot access laws as the current plaintiffs, and seeks the same relief.  As he concedes, "[t]he relief sought by Andy Gottlieb and the plaintiffs in their lawsuit would relieve my campaign of the severe burden of Connecticut's ballot access laws by letting us take out petitions and gather signatures beginning on the first business day of the year."  Decl. of Anthony

---

[7] The court notes that plaintiffs have been a bit inconsistent in their representations about how reopening discovery and prolonging this case would prejudice them.  In one breath, in their Motion to Exclude the expert testimony of Bromley and McDonough, they have argued that "delaying this case would jeopardize plaintiffs' ability to obtain any practical relief at all in time for the elections."  Pls.' Mot. to Exclude Bromley and McDonough Test. Mem. at 6.  Yet now, when they seek to add DiLizia as a plaintiff, they seem to have no issue with "partially reopening discovery" because State defendants "have time to depose Mr. DiLizia if they believe it is necessary."  Pls.' Mot. to Add Party Mem. at 2.

DiLizia at ¶ 8.  Given that plaintiffs' argument about good cause appears to be premised on "cur[ing] the standing and ripeness issues raised by the State Defendants", the court's determination that those arguments by the State defendants do <u>not</u> have merit obviates that rationale.  That, coupled with the waste of judicial resources and undue delay permitting such a late amendment to the pleadings would cause, counsels against granting plaintiffs' Motion here.

The Motion to Add Party Plaintiff is therefore denied.

## VI.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The court next addresses the merits of the parties' cross-Motions for Summary Judgment.  First, it finds that plaintiffs have standing and that their claims are ripe for adjudication.  It then concludes that, on the record before it and under the prevailing standards, Connecticut's restrictions on primary ballot access are reasonable and non-discriminatory, and serve an important state interest in regulating elections.

### A.   <u>Standing and Ripeness</u>

As an initial matter, State defendants argue that plaintiffs lack standing and that their claims are not ripe.  State defendants, however, ignore the fact that the Second Circuit has already addressed this exact question in a similar context and rejected both of these arguments.

In <u>Lerman</u>, plaintiffs also challenged the constitutionality of certain ballot access provisions in New York.  The defendant in that case first "argue[d] that the plaintiffs' claims [were] moot, since the . . . primary election [was] over."  <u>Lerman</u>, 232 F.3d at 141.  The Circuit rejected that argument in a single paragraph, finding that defendant's "contention [was] mistaken since the plaintiffs' claims fall within the exception to the mootness doctrine for issues 'capable of repetition yet evading review.'"  <u>Id.</u> (quoting

Meyer v. Grant, 486 U.S. 414, 417-18 n. 2 (1988)).  As was the case in Lerman, "[b]oth of the two preconditions for invoking th[e] [capable of repetition] doctrine have been met" in this case: "the challenged action was too short to be fully litigated prior to its expiration, and there is a reasonable expectation that the same complaining parties would be subject to that same action in the future."  Id.  Indeed, Gottlieb has announced he is again running for office in 2022.  Even if he were not, the Lerman standard is certainly met as to plaintiffs' asserted injuries as voters unable to cast their ballot for their preferred candidates.

Second, plaintiff Gottlieb has standing here because he is running for office again in 2022, and as such is subject to the very primary ballot access laws plaintiffs challenge in this case.  Even if he were not, however, he would – and the other plaintiffs do – still have standing under the Lerman standard.  Although that case was only at the pleading stage, the Circuit began its standing analysis by noting that, "since the plaintiffs challenge a statute regulating the ability to engage in interactive political speech and associational activity, their standing to challenge the statute on its face [was] governed by the overbreadth doctrine."  Id. at 144.  "Under the overbreadth doctrine, the plaintiffs need only 'demonstrate a substantial risk that application of the provision will lead to the suppression of speech.'"  Id. (quoting National Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998)).  That is clearly the case here, as all three plaintiffs have alleged injuries from their inability to vote for their preferred candidates.  Moreover, before announcing his candidacy in January 2022, Gottlieb was unsure if he would run again, averring that "[i]f Connecticut's ballot access requirements were less restrictive, [he] would be much more inclined to [do so] in the future."  Aff. of Andy Gottlieb at ¶ 5 (Doc.

No. 75-2).  Given that plaintiffs have brought forth evidence demonstrating a

"substantial risk" that Connecticut's ballot access laws will lead to the suppression of

speech, they have standing to bring this suit.

      B.     The Anderson-Burdick Framework

      "The Supreme Court has long recognized that 'unduly restrictive state election

laws may so impinge upon freedom of association as to run afoul of the First and

Fourteenth Amendments.'"  Gottlieb, 465 F. Supp. 3d at 47 (quoting Kusper v. Pontikes,

414 U.S. 51, 57 (19773)).  "That includes state laws" – such as the ones at issue here –

that "govern[ ] which candidates may appear on a ballot, including primary ballots."  Id.

(citing cases).  Although there is "no litmus-paper test [that] will separate valid ballot-

access provisions from invalid interactive speech restrictions", courts in this Circuit

apply a two-step inquiry to weigh the severity of a ballot access law against a state's

interest in promulgating such a restriction.  The Second Circuit has summarized this

test, commonly referred to as the "Anderson-Burdick" framework, as follows:

> First, we ascertain the extent to which the challenged restriction burdens
> the exercise of the speech and associational rights at stake.  The restriction
> could qualify as reasonable [and] nondiscriminatory or as severe.  Once we
> have resolved this first question, we proceed to the second step, in which
> we apply one or another pertinent legal standard to the restriction.

> If the restriction is reasonable [and] nondiscriminatory, we apply the
> standard that has come to be known as the Anderson-Burdick balancing
> test: we must first consider the character and magnitude of the asserted
> injury to the rights protected by the First and Fourteenth Amendments that
> the plaintiff seeks to vindicate, and then . . . identify and evaluate the precise
> interests put forward by the State as justifications for the burden imposed
> by its rule.  In passing judgment under this more flexible standard, we must
> determine [both] the legitimacy and strength of each of those interests and
> the extent to which those interests make it necessary to burden the plaintiff's
> rights.

> If the restriction is severe, then we are required to apply the more familiar
> test of strict scrutiny: whether the challenged restriction is narrowly drawn

to advance a state interest of compelling importance.  It follows then that the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged [restriction] burdens First and Fourteenth Amendment rights.

Yang v. Kosinski, 960 F.3d 119, 129 (2d Cir. 2020).  In conducting this inquiry, courts do not consider each avenue to the ballot in isolation; rather, they must "consider the challenged regulations, and the burdens they impose . . . 'within the context of the state's overall scheme of election regulations.'"  Gottlieb, 465 F. Supp. 3d at 48 (quoting Lerman, 232 F.3d at 145).  "Under [this] totality approach", if any of the three avenues Connecticut provides to access the primary ballot "would be constitutional standing alone, the other[s] must be viewed as broadening the opportunities for ballot access and [as] a fortiori constitutional."  LaRouche, 990 F.2d at 39.

C.    Connecticut's Overall Election Scheme and the Burden on Plaintiffs' Rights

The first step of the Anderson-Burdick test requires the court to assess whether the burden on plaintiffs' rights "qualif[ies] as reasonable [and] nondiscriminatory or as severe."  Yang, 960 F.3d at 129.  "'The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.'"  Gottlieb, 465 F. Supp. 3d at 48 (quoting Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016)).  Here, plaintiffs focus their efforts only on challenging the reasonableness of the third avenue to access the primary ballot in Connecticut – petitioning.

As discussed above, supra Section II, petitioning on to the primary ballot in Connecticut requires candidates for district offices to collect the signatures of five percent of the enrolled party members in their district in a 14-day period.  State Defs.' R. 56(a)1 Stmt at ¶ 161; Pls.' R. 56(a)2 Stmt at ¶ 161.  For state-wide and U.S. congressional offices, the time period candidates have to collect the signatures expands

to 42 days, although only two percent of the party members are required.  State Defs.'

R. 56(a)1 Stmt at ¶¶ 156, 161; Pls.' R. 56(a)2 Stmt at ¶¶ 156, 161.  In 2020, this meant

that candidates for State Assembly were required to gather between 12 and 503

signatures in 14 days; candidates for State Senate were required to gather between 103

and 1,761 is the same timeframe; and candidates for U.S. Congress were required to

gather between 1,484 and 3,766 signatures in 42 days.  State Defs.' R. 56(a)1 Stmt at ¶

181; Pls.' R. 56(a)2 Stmt at ¶ 181.[8]  This translates to a range of 0.86 to 36 signatures

per day of petitioning for Assembly District candidates; 7 to 126 per day for State

Senate candidates; and 35 to 90 per day for U.S. congressional candidates.  State

Defs.' R. 56(a)1 Stmt at ¶¶ 182-84; Pls.' R. 56(a)2 Stmt at ¶¶ 182-84.

The evidence in the record as to how difficult these thresholds would be to obtain

is disputed.  Reading the evidence in the light most favorable to plaintiffs, the signature

requirements do not virtually exclude candidates from accessing the ballot through

petitioning.  In support of their Motion for a Preliminary Injunction, plaintiffs had

submitted an Affidavit from Tawana Galberth, an experienced petitioner with "over

twenty years of experience . . . with petitions and getting signatures."  See Aff. of

Tawana Galberth at ¶ 4 (Doc. No. 31-4).  Galberth then averred that "a highly-skilled

campaign worker who works hard for seven hours during the day can collect up to 80 or

more valid Democratic Party registered voter signatures in New Haven."  Id. at ¶ 8.

However, due to COVID-19, Galberth had observed that this number for some of these

---

[8] Critically, these are the signature thresholds prior to Governor Lamont issuing the Executive
Order lowering the requirements by 30%.  See id.  However, these are the relevant numbers for the
purposes of this Motion since the Governor's Executive Order does not apply to the 2022 primary
elections.

highly skilled volunteers had dropped to 6-13 per day.  Id. at ¶¶ 16, 19.  At the Motion for Summary Judgment stage, plaintiffs now rely on an Affidavit from Gottlieb stating that, while candidates themselves can achieve up to 50 signatures "on the most advantageous day", during a 2021 campaign as a non-candidate he could average only 1-5 signatures per hour, i.e., 7 to 35 on the average day.  Aff. of Andy Gottlieb at ¶¶ 2, 6.

Even using a number at the lowest end of that spectrum – say, 10 votes per day per circulator and 20 for the candidate – it can hardly be said that Connecticut's primary ballot access requirements impose a "severe burden" on plaintiffs' rights.  Accounting for the fact that, in Gottlieb's words, "the candidate has a much easier time gathering signatures", assembly candidates would need approximately two volunteers per day to access the ballot in the most burdensome district; state senate candidates approximately eleven; and congressional candidates seven.  Aff. of Andy Gottlieb at ¶ 3. These numbers are for the most burdensome districts using the most conservative estimates of signature rates – in most districts, the requirements would be far less. See, e.g., State Defs.' R. 56(a)1 Stmt at ¶ 205; Pls.' R. 56(a)2 Stmt at ¶ 205 (noting that plaintiff Gottlieb was required to collect 1,014 valid signatures for his 2018 campaign in 14 days, a rate of 72.4 per day).  Although these numbers require candidates to achieve a "significant modicum of support" from the community in order the access the primary ballot through petitioning, that is entirely appropriate.  Jenness v. Fortson, 403 U.S. 431, 442 (1971).  Though the requirements certainly are a burden on candidates – perhaps even a significant one – they do not constitute a "severe burden" that "virtual[ly]

exclu[des]" candidates from the ballot.  <u>Gottlieb</u>, 465 F. Supp. 3d at 48 (internal quotations and citations omitted).

This conclusion is buttressed by the history of candidates petitioning on to primary ballots in Connecticut in recent years.  In 2018, there were 49 non-endorsed candidates who were able to access the ballot in party primaries.  Eighteen of those candidates accessed the ballot through petitioning, including a state senate candidate who collected 1,585 signatures in 14 days.[9]  State Defs.' Ex. 7 at SA084-SA085.  In 2016, there were 17 non-endorsed candidates, of which 10 accessed the ballot through petitioning.  State Defs.' R. 56(a)1 Stmt at ¶ 174; Pls.' R. 56(a)2 Stmt at ¶ 174.  Even in 2020, amidst the COVID-19 pandemic – though albeit with lowered requirements due to Governor Lamont's Executive Order – there were 14 non-endorsed candidates who participated in primaries, of which 8 petitioned on to the ballot.  State Defs.' R. 56(a)1 Stmt at ¶ 171; Pls.' R. 56(a)2 Stmt at ¶ 171; State Defs.' Ex. 7 at SA083.[10]  These numbers do not suggest that candidates are virtually excluded from the primary ballot if they attempt to petition on to it.

Nor does the recent surge in Omicron cases across Connecticut or plaintiffs' focus on comparing Connecticut's ballot access laws to other states alter this conclusion.[11]  Unlike in 2020, plaintiffs have come forward with no evidence upon which

---

[9] In their Rule 56(a)1 Statement, State defendants claim this number was 19.  State Defs.' R. 56(a)1 Stmt at ¶ 173; Pls.' R. 56(a)2 Stmt at ¶ 173.  As plaintiffs point out, however, a review of the evidence shows it was 18.  State Defs.' Ex. 7 at SA084-SA085.

[10] Here, it is plaintiffs who appear to have the incorrect number.  They assert there were 16 non-endorsed candidates in primaries in 2020.  <u>See</u> Pls.' R. 56(a)2 Stmt at ¶ 171.  The evidence, however, suggests State defendants' number 14 is correct.  State Defs.' Ex. 7 at SA083.

[11] In addition, as of the date of this Ruling, cases in Connecticut have decreased dramatically from the peak of the Omicron wave in early January.  <u>See</u> <u>Tracking Coronavirus in Connecticut</u>, N.Y.

a reasonable jury could conclude that Governor Lamont has implemented similar "restrictions on all workplaces of nonessential businesses . . . prohibited social gathering[s] of six people or more", or implemented other restrictions that would substantially hinder plaintiffs' ability to gather signatures, as was the case in 2020 during the early days of the pandemic.  Gottlieb, 465 F. Supp. 3d at 45 (describing the Executive Orders signed by the Governor in response to COVID-19 in early to mid-2020).  While the surge in Omicron cases is likely to present an additional burden on petitioning candidates in the coming months, the absence of these sorts of restrictions – and the wide availability of vaccines in 2022 – means that, even absent modifications to the signature requirements similar to the ones implemented through Executive Order in 2020, petitioning does not present a severe burden on plaintiffs.

Finally, plaintiffs' earnest attempts to compare the rigidity of Connecticut's petitioning requirements to those of other states fall short of demonstrating a severe burden.  Although the court has excluded the purported expert testimony of plaintiff Gottlieb, see supra Section IV.C, it notes here that even had his testimony been admitted, it would not alter the conclusion that the petitioning requirement does not impose such a burden on plaintiffs' rights.  As plaintiffs concede, even if they were to show that Connecticut's petitioning requirements were among the most burdensome in the country, it would not necessarily follow that they constitute a severe burden.  See Pls.' Mot. for Summ J. Reply at 8 ("To be sure, the plaintiffs have never argued that simply because Connecticut's requirements are among the most severe, they are necessarily unconstitutional.  But comparison is useful").  While Connecticut would be

---

Times (last accessed Feb. 8, 2022), https://www.nytimes.com/interactive/2021/us/connecticut-covid-cases.html.

perfectly entitled to "require[e] party-candidate selection through processes more favorable to insurgents . . . th[at] is a far cry from saying that the Constitution demands it." Lopez Torres, 552 U.S. at 205. As Justice Stevens emphasized in his Lopez Torres concurrence, there is a "distinction between constitutionality and wise policy", and a "holding with respect to the former should not be misread as endorsement of the electoral system under review." Id. at 209 (Stevens, J. concurring).

Finally, as the court stressed in its Ruling on the Motion for a Preliminary Injunction, it must "[a]pply[ ] LaRouche's 'totality approach' here, and [continue to be] guided by the Supreme Court's holding in Lopez Torres. Gottlieb, 465 F. Supp. 3d at 53.[12] Under that approach, the court assesses all three avenues to the primary ballot together. Id. Because "Lopez Torres held that one of these avenues – selection by convention – is constitutional", even had petitioning itself imposed a severe burden on plaintiffs, they still could not show that the election scheme overall did as well. Id. "[B]ecause selection by convention is adequate standing alone, and because the other alternatives provide additional means of accessing the same ballot, the court [continues to] view[ ] these alternatives – including the petitioning process – as 'broadening the opportunities for ballot access and a fortiori constitutional.'" Id. at 54 (quoting LaRouche, 990 F.2d at 99.

For all the above reasons, plaintiffs have failed to bring forth evidence upon which a reasonable jury could conclude that Connecticut's overall scheme for accessing the primary ballot imposes a severe burden on them.

---

[12] The court also concludes that Campbell v. Bysiewicz, 213 F. Supp. 2d 152 (D. Conn. 2002), is inapposite, for the same reasons it articulated in the Ruling on the Motion for a Preliminary Injunction. Id. at 53 n. 15.

D.     Connecticut's Asserted Interest

Because Connecticut's primary ballot access laws do not impose a severe burden on plaintiffs' rights, the court proceeds to the next step of the Anderson-Burdick test: "balanc[ing] plaintiffs' asserted First Amendment injuries against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'" Id. (quoting Yang, 960 F.3d at 129).  "'Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests.'"  Id. (quoting Price v. Bd. of Elections, 540 F.3d 101, 109 (2d Cir. 2008)).

Here, defendants have asserted several important state interests.  First, Connecticut "has a strong interest in conducting orderly, fair, and transparent elections." Decl. of Theodore E. Bromley at ¶ 61.  Part of this entails ensuring that candidates who appear on the primary ballot have a "significant modicum of support."  Jenness, 403 U.S. at 442 ("[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot").  As Bromley averred, "Connecticut's petition requirements ensure that only well-organized candidates with support among the enrolled party members appear on the primary ballot."  Decl. of Theodore E. Bromley at ¶ 65.

In addition, the petitioning deadlines promulgated by the state also serve the state's "interest in the orderly and efficient administration of elections."  Gottlieb, 465 F. Supp. 3d at 55 (citing cases).  "The timing of the petitioning window [for district primaries] encourages candidates to seek the support of the convention delegates [first] . . . rather than bypass the conventions altogether."  Decl. of Theodore E. Bromley at ¶

31

63.  In this way, Connecticut's regulations "discourage candidates from bypassing the core engaged party members, unless they are confident that they have a broad degree of support [from] the broader enrolled party members in the district."  State Defs.' Mot. for Summ. J. Mem. at 37.  Given that the Supreme Court has recognized that a state has an important interest in promulgating regulations to ensure "the stability of their political systems" that "may, in practice, favor the traditional two-party system" and "temper the destabilizing effects of party-splintering and excessive factionalism", Connecticut's interests are sufficiently important to justify reasonable and non-discriminatory restrictions on access to primary ballots.[13]  Timmons v. Twin Cities Area New Party, 520 U.S. 351, 366-67 (1997).

Taken together, the court concludes that there is no evidence in the record upon which a reasonable jury could conclude that the state's interest in promulgating these regulations does not outweigh the reasonable and nondiscriminatory burdens they impose on plaintiff's rights.  The court therefore grants State defendants' Motion for Summary Judgment, and denies plaintiffs' Motion for Summary Judgment.

## VII.    CONCLUSION

For the reasons state above, the court: (1) grants the State defendants' Motion to Exclude the Expert Testimony of plaintiff Gottlieb; (2) grants in part and denies in part

---

[13] Plaintiffs make much of the fact that certain state senate races require fewer signatures per day than state-wide ones, and that Connecticut's argument for not allowing those state senate candidates to circulate petitions before the convention "gloss[es] over that for offices of U.S. Representative, U.S. Senator, and statewide offices, candidates are allowed to circulate petitions before the convention."  Pls.' Mot. for Summ J. Reply at 11.  The court does not disagree that there are inconsistencies in Connecticut's regulations, but that it not the question it is being asked to address here.  "'The Constitution does not prohibit legislatures from enacting stupid laws.'"  Lopez Torres, 552 U.S. at 209 (Stevens, J., concurring) (quoting Marshall, J.).  Rather, this court must assess whether "the Constitution demands" that a state's primary ballot access laws be enjoined. Id. at 205.

plaintiffs' Motion to Exclude the Expert Testimony of Bromley and McDonough; (3)

denies plaintiffs' Motion to add a party plaintiff; (4) denies plaintiffs' Motion for Summary

Judgment; (5) grants State defendants' Motion for Summary Judgment, and; (6) grants

plaintiffs' Motion for Leave to File Excess Pages.


**SO ORDERED.**

Dated at New Haven, Connecticut this 8th day of February 2022.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge